# AFFIDAVIT

I, Jason Mackey, being first duly sworn, hereby depose and state as follows:

## I. INTRODUCTION

1. I make this affidavit in support of an application for a search and seizure warrant for the Administrative Offices of HERGUAN UNIVERSITY (HGU) and the UNIVERSITY OF EAST-WEST MEDICINE (UEWM) (collectively, the "SUBJECT PREMISES"), both located at 595 Lawrence Expressway, Sunnyvale, California, as further described in Attachment A.

2. For the reasons set forth below, there is probable cause to believe that the SUBJECT PREMISES contain items, as further described in Attachment B, which constitute evidence, fruits, and/or instrumentalities of violations of 18 U.S.C. § 371 (Conspiracy to Commit Visa Fraud); 18 U.S.C. § 1546(a) (Visa Fraud); 18 U.S.C. § 1030(a)(3) (Unauthorized Access to a Government Computer); 18 U.S.C. § 1001(a)(3) (Use of False Documents); 18 U.S.C. § 1028A (Aggravated Identity Theft); and 18 U.S.C. § 2 (Aiding and Abetting).

3. The statements contained in this affidavit are based upon my personal knowledge and/or on information provided by other law enforcement officers, agents, and personnel, as well as on my experience, background, and training. Because this affidavit is submitted for the limited purpose listed above, I have not included each and every fact known to me concerning this investigation. I have set forth only those facts that I believe are necessary to establish probable cause. Where I have reported statements made by others or from documents that I have reviewed, those statements are reported in substance and in part, unless otherwise noted.

## II. AGENT BACKGROUND

4. I have been a Special Agent with the Department of Homeland Security (DHS), Immigration and Customs Enforcement (ICE), Homeland Security Investigations (HSI), or its predecessor agency, the United States Customs Service, since November 2002. Since April 2009, I have been assigned to the Document and Benefit Fraud Task Force for the San Francisco, California, Office of the Special Agent in Charge. My previous assignments include the Joint Terrorism Task Force (2007-09), the Compliance Enforcement Unit (2006-07), the Benefit Fraud Unit (2004-06), and the Contraband Smuggling Group (2002-04).

5. Since 2004, I have participated in at least 50 visa fraud investigations, three of which involved educational institutions, and have interviewed hundreds of aliens suspected of violating the U.S. immigration laws. I have been involved in over 25 search warrants, at least ten of which alleged visa fraud violations, and over 50 arrests for student visa violations.

6. In addition to completing the Criminal Investigator Training Program and the Customs Basic Enforcement School at the Federal Law Enforcement Training Center (2003), I have received extensive training in enforcing U.S. immigration laws and investigating immigration benefit fraud schemes. I have participated in the Customs-Immigration Cross Training Program (2004), ICE's National Security Investigations Western Region Training

Conference (2008), and ICE's Document Fraud and Terrorism course (2010). From these trainings I learned about common indicators of visa fraud and student visa status violations.

7. I have also discussed this investigation with an ICE adjudicator assigned to the Student Exchange and Visitor Program (SEVP) School Certification Branch, who has been involved in the inspections of at least 27 SEVP-approved schools. From these discussions, I know that all U.S. schools must file a petition and be approved by SEVP before they can sponsor foreign nationals to receive student status to enter and remain in the United States. SEVP approval is contingent upon a petitioning school's agreement to abide by certain regulations that require, among other things, reporting of foreign student residence addresses and failure of foreign students to maintain full courses of study. A school that does not comply with the reporting requirements may have its sponsorship privileges revoked.

8. As a result of this training and experience, I am familiar with the United States' immigration laws and regulations, including those relating to student visas and status violations. I am aware that an alien who has entered the United States on a valid student visa may become removable if that alien fails to comply with the visa terms. I know that there is a very high demand for student visas, and that some people seek such visas as a means of entry into the United States without ever intending to pursue a full course of study. I also know that some schools seek to profit from the demand for student visas by issuing visa-related documents and falsely reporting students' status to DHS in exchange for "tuition" fees. Such schools are typically not accredited, although they often claim to be in the process of receiving accreditation, have unusually low attrition rates, and lack reasonable facilities to accommodate student instruction. Typically, the student populations of such schools are predominately foreign nationals, heavily weighted toward a few ethnic groups due to the tendency to recruit by word of mouth (with referral payments to current students).

### III. SUMMARY OF STUDENT VISA PROGRAM

9. The Immigration and Nationality Act identifies several categories of foreign nationals who may be admitted to the United States for non-immigrant purposes. *See* 8 U.S.C. § 1101. One such category, designated "F-1," comprises "bona fide student[s]" coming temporarily to study at an approved school. 8 U.S.C. § 1101(a)(15)(F)(i); 8 C.F.R. § 214.1(a)(2). Those entering the United States on an F-1 student visa are admitted for a temporary period called "duration of status," meaning "the time during which an F-1 student is pursuing a full course of study" at an approved school. 8 C.F.R. § 214.2(f)(5)(i). When a student stops pursuing a full course of study, the duration of status ends and the temporary period for which the individual was admitted expires.

10. A school seeking approval to admit foreign students must submit a Petition for Approval of School for Attendance by Nonimmigrant Student, also called a Form I-17, to SEVP in Washington, D.C. The I-17 is first submitted electronically, through the Student and Exchange Visitor Information System ("SEVIS"). As part of the I-17 approval process, SEVP conducts a site inspection, during which the inspector collects an original, signed I-17 and supporting documents. For an unaccredited school, the supporting documents generally include

evidence establishing that its courses have been and are unconditionally accepted by at least three accredited institutions of higher learning.

11. The petitioning school must also provide SEVP with a Record of Designated School Officials ("DSOs"), called a Form I-17A, which the DSOs must sign to certify their knowledge of and intent to comply with student immigration laws and regulations. Once a school is approved, its DSOs are issued login IDs and passwords enabling them to access SEVIS. SEVIS is a nonpublic computer system located in Rockville, Maryland, which is used by the United States government and operated through SEVP for the purpose of collecting nonimmigrant student information from approved schools and monitoring such aliens' status. SEVIS is accessible only by DSOs and government personnel.

12. To enter the United States on a student visa, a foreign national must present a Certificate of Eligibility for Nonimmigrant ("F-1") Student Status, also known as a Form I-20, which is printed from SEVIS. An "initial I-20" certifies that the student has been accepted for enrollment in a full course of study, and is signed by a DSO. The school activates the student's SEVIS record and prints an "active I-20" after the student arrives and begins making normal progress toward a full course of study, which requires physical attendance. The school's DSOs are required to report in SEVIS within 21 days the failure of any student to maintain active status.

13. SEVP-certified schools are required to keep certain records and information relating to each foreign student to whom it has issued a Form I-20, and such records and information must be provided to SEVIS upon request. See 8 C.F.R. § 214.3(g)(1). Among other things, the schools must retain the student names, dates of birth, applications, dates of commencement and termination of studies, and I-20s. An experienced SEVP adjudicator, who has conducted over forty Site Visits, has advised me that every school at which she has conducted a Site Visit maintained these student records on the school's campus.

14. It is a criminal offense to "knowingly forge[] ... or falsely make[] any ... document prescribed by statute or regulation for entry into or as evidence of authorized stay ... in the United States," or to "use[], attempt[] to use, posses[], obtain[], accept[], or receive[]" any such document, "knowing it to be forged ... or falsely made, or to have been procured by means of any false claim or statement, or to have been otherwise procured by fraud or unlawfully obtained." 18 U.S.C. § 1546(a).

### IV. SUMMARY OF PROBABLE CAUSE

A. Background

15. HGU is located in Sunnyvale, California and purports to offer Master's degrees in Computer Science, Electronics Engineering, and Business Administration. According to HGU's website, Jerry WANG ("WANG") is the CEO; Ying Qiu Wang ("Ying") is the President; and Su Tong ("Tong") is the CFO. Immigration records show that Ying is WANG's father and Tong is WANG's mother; the family immigrated to the United States from China in 1993-94. WANG,

age 34, and Ying, age 63, are naturalized U.S. Citizens. Tong, age 63, is a Lawful Permanent Resident.

16. Ying is also the founder and President of UEWM, located on the same campus as HGU, at 595 Lawrence Expressway. According to UEWM's website, WANG is the CEO.

17. On July 24, 2012, a grand jury in the Northern District of California returned a fifteen-count Indictment against WANG. The Indictment (CR 12-581 EJD) charges WANG with conspiracy to commit visa fraud, in violation of 18 U.S.C. § 371; visa fraud, in violation of 18 U.S.C. § 1546(a); unauthorized access to a government computer, in violation of 18 U.S.C. § 1030(a)(3); use of false documents, in violation of 18 U.S.C. § 1001(a)(3); aggravated identity theft, in violation of 18 U.S.C. § 1028A; and aiding and abetting, in violation of 18 U.S.C. § 2. This Indictment is filed under seal pending WANG's arrest. ICE is planning to arrest WANG at the time this search warrant is executed.

### B. HGU's I-17 and False Attachments

18. I know from my review of SEVIS records that a Form I-17 for HGU was submitted electronically on July 6, 2007. The I-17 identified the date of HGU's establishment as December 12, 2005, and Ying as its owner. Form I-17A, Supplement A identifies WANG as the Primary (and sole) DSO. At the time the petition was submitted, HGU and UEWM were located at 970 W. El Camino Real in Sunnyvale, CA.

19. SEVIS records show that HGU's site visit occurred on July 30, 2007, at the 970 W. El Camino Real location. The site visit inspector noted that "UEWM apparently control the records for Herguan University because the school (Herguan) does not have a separate registrar's office" and "according to the PDSO that non-immigrant student records will be kept in a lock file cabinet located in the Registrar's office of UEWM upon approval of SEVIS" [sic].

20. During the site visit, the SEVP inspector interviewed WANG as the "owner" and Primary DSO, and collected from him HGU's original, signed I-17 and I-17A, as well as three transfer letters. The I-17 is signed by Ying as President, dated July 10, 2007. The I-17A is signed by WANG and Ying.

21. The first agreement, dated July 9, 2007, purports to be from Andres Bella of the Academy of Chinese Culture & Health Services (ACCHS). The letter represents that Bella supports HGU's I-17 petition, and that HGU student "Li Ling" had transferred credits to ACCHS. I have interviewed Bella, however, and he denies having written such a letter in support of HGU. Rather, Bella advised, he wrote the letter in support of UEWM. Bella said that he would never provide such a letter for HGU because it was not accredited. Moreover, Bella said he did not know a "Li Ling" and was not aware of her transferring to ACCHS. I also interviewed a Ling Li who advised that she worked as the admissions director for UEWM, where WANG was her supervisor. Li denied having ever taken classes at UEWM, HGU, or ACCHS, or attempting to transfer any credits to any of these schools.

22. The second transfer letter provided to the inspector was from Chengguang Shi of UEWM, dated July 8, 2007. The letter advises that Su Tong – WANG's mother – was a transfer

student from HGU. When interviewed, Shi admitted that WANG, Ying, and Tong are his supervisors at UEWM. Shi said he could not verify anything in the letter as true. He did not recall signing the letter, or recall Tong transferring credits to HGU, however he advised that he signed many UEWM documents without reading them. I have not yet interviewed Tong due to the family relationship. The third transfer letter, from Yo San University of Traditional Chinese Medicine in Los Angeles, contained non-committal language, rather than the language required by regulation, and the author, Lawrence Lau, confirmed his signature. (Neither the second nor the third transfer letter is charged in the Indictment.)

### C. HGU's False Supplemental Submissions

23. SEVIS records show that, on August 8, 2007, SEVP issued a request for evidence, stating that it needed letters from three different schools "attesting they have accepted, and continue to accept unconditionally, credits from your school" or, alternatively, three employment letters, "written and signed by the employer(s) attesting graduates of your school are fully qualified in their field of study, as a result of the training they gained at your institution." The request for evidence further instructed: "Additionally your school should provide evidence supporting the students referenced in the letters, or college acceptance letters, program enrollment and completion/transfer dates (e.g. transcript copies)." It is not clear why SEVP requested three more articulation agreements; SEVP personnel are not able to say definitively based on the records. There is a note in the SEVP file stating that the "letters" were incomplete, followed by a notation that a Request for Evidence had been issued.

24. In response to SEVP's request, WANG sent SEVP a signed cover letter with employment letters and transcripts for purported HGU graduates Candace Zheng, Shane Guan, and David Wang (no known relation to WANG). WANG's cover letter is undated, but it bears a "Received by SEVP" stamp with the date August 16, 2007. The transcripts contain the student's names, dates of birth, and social security numbers; are on HGU letterhead; and are dated August 8, 2007. Each transcript lists identical courses and the same sequence of courses taken for each purported student.

25. The first employment letter, from Alex Shi of UEWM, states that Zheng works for UEWM as an "herbal consultant/manager assistant" and that she graduated from HGU in April 2007. Shi is the same individual who signed the UEWM transfer letter, and who is the employee of WANG, Ying, and Tong. Shi stated that he could not recall what Zheng's position was but knew she worked at UEWM's clinic. Zheng, who had changed her last name to Luo shortly before she was interviewed, stated that she graduated from UEWM in December 2008, worked for UEWM as a receptionist, and never attended HGU. She confirmed the social security number and date of birth on the transcript as her own, but noted that her dates of attendance and graduation were false.

26. The second employment letter, from JingGang Tang of Vital Core Biosystems Inc., states that Shane Guan graduated from HGU on April 15, 2007 and is employed by Vital Core as a Marketing Officer. When interviewed, Guan stated that he had never heard of Vital Core and never worked for them. He advised that he was a student at UEWM and had not yet graduated. He knew that HGU was co-located with UEWM. After being shown a copy of the

5