HGU transcript, Guan stated that he did not want to say anything derogatory about UEWM or HGU because his mother is friends with the schools' owners. He confirmed his social security number and date of birth, and suggested that perhaps he had taken HGU courses and graduated without realizing it. Tang explained that Vital Core is the supply department of UEWM and that WANG is his direct supervisor. Shown the employment letter, Tang stated that WANG had typed it and asked him to sign, explaining that it was a reference letter that would be used to help Guan get a job. Tang stated that he did not know Guan but felt pressured by WANG to sign the letter.

27. The third letter, from "Lin Lee" of International Institutes for Health and Healing (IIHH), states that David Wang is an Herbal Researcher who graduated from HGU on April 15, 2007. When interviewing Li in connection with the articulation agreement, agents showed Li the IIHH employment letter. Li recognized the phone number in the IIHH letterhead as her old personal cell phone number, but denied having seen the employment letter before, having ever worked for IIHH, or knowing a David Wang. She thought the signature closely resembled hers, however, and brought a sample signature to show the interviewing agents. Having worked for Jerry WANG as the UEWM's admissions director in 2007, Li admitted that she signed many documents in this capacity without reading them. Phone records confirm that the phone number on the employment letter belonged to Li at the time in question. I have not yet located or interviewed David Wang.

### D. Unauthorized SEVIS Access and Creation of Forged I-20s

28. I have interviewed a Yehpin (Carrie) Yang. She advised me that she was hired in May 2009 to be an administrative assistant for HGU, but shortly after she began, WANG asked her to work as the school registrar. According to Yang, quickly after her hiring, WANG gave her his SEVIS user name and password for her to access the SEVIS database and create I-20s for HGU F-1 students. Emails between Yang and WANG confirm that Yang was accessing WANG's SEVIS account; indeed, she changed his password with his consent.

29. Yang told me that, after she created I-20 records, she would print them out for signature. Because she created the forms using WANG's account, the forms automatically printed with WANG's signature block. At WANG's request, when he was not available, Yang had Tong or Ying sign the forms. Yang reported that Tong and Ying tried to imitate WANG's signature. If they accidentally signed in their own names, they would tear up the I-20 and sign a new one in WANG's name. When all three were to be traveling, WANG instructed Yang to sign I-20s herself; she refused. Yang quit working for HGU in August 2010.

30. I have also interviewed a Ling Zhang, who worked as a registrar for HGU between October 2008 and September 2009. Similar to Yang, Zhang told me that WANG gave her his SEVIS username and password shortly after she began working for him, and instructed her to enter data in SEVIS and print I-20s. Zhang advised that WANG also told her to take the I-20s to Tong and Ying for signature if he was not available, and that she observed Tong and Ying forge WANG's signature. Zhang further stated that, once WANG delegated his SEVIS responsibilities, he came to the office much less frequently -- sometimes only five minutes in a day to sign I-20s, and on some days not at all.

31. Zhang stated that at one point, WANG told her that it was illegal for her to access SEVIS, and because of this, she should become a DSO and obtain her own SEVIS account. Zhang advised that she was not comfortable signing up with the government to become a DSO, due to the forged signatures and her observations that HGU admitted all applicants upon payment of fees, regardless of qualifications or missing documentation.

32. U.S. Customs and Border Patrol (CBP) records show that WANG took several international trips in 2009 and 2010. SEVIS records show that approximately 125 Form I-20s were created during periods when CBP records show that WANG was out of the United States. For example, CBP records show that WANG left the United States for China on September 11, 2010 and returned on October 6, 2010. ICE agents have acquired four I-20s created during this time frame, and have interviewed the students who received them. All four were created between September 20 and 23, 2010, with a signature purporting to be WANG's.

### E. SEVP/ICE Compliance Visit

33. On November 17, 2010, I participated in a SEVP Compliance Site Visit of HGU. By this time HGU had moved to the current location at 595 Lawrence Expressway, Sunnyvale, CA. The SEVP personnel identified themselves as such, but my fellow ICE agent and I did not identify ourselves as federal agents at first. During the visit, we interviewed WANG. SEVP's standard Compliance Site Visit form asks what action the school takes to ensure students' progression with their courses of study and failure to maintain such progress. WANG advised that attendance is monitored by students signing attendance sheets; that students receive an "F" grade for failure to attend classes, followed by academic probation and termination; and that foreign students failing to meet full course of study requirements are issued academic warning letters and then terminated in SEVIS. WANG further advised that student records were currently stored in a locked fireproof cabinet in the registrar's office.

34. After the interview, SEVP personnel requested a campus tour. WANG agreed and pointed out several lightly attended classes in session, which he said were HGU classes. After the personnel asked to sit in and meet the instructors, WANG admitted that these were UEWM classes and that all HGU classes had been cancelled for the evening. My fellow agent and I then identified ourselves as such and advised WANG we knew there was no physical attendance by foreign HGU students – a violation of SEVP regulations. WANG then stated that HGU used to require physical attendance, but students had transferred to other schools. WANG explained that HGU had recently begun major campus renovations and was temporarily allowing all of its foreign students to attend entirely online. They planned, however, to resume physical classes in the near future. At the conclusion of the site visit, SEVP personnel gave WANG a Request for Evidence, asking for attendance records, academic warning letters, and articulation agreements with accredited schools (agreements representing that the school unconditionally accepts credits from HGU), among other things.

35. On December 16, 2010, WANG sent SEVP a signed and notarized letter responding to its Request for Evidence. WANG stated in the letter: "During the renovations, [HGU] allowed students to enroll in simultaneous broadcasting classes for the Fall 2010

7

semester, which caused significant educational challenges and SEVIS compliance issues during this semester." In fact, various documents – including numerous emails from students and a November 30, 2010 email to WANG from HGU's Admissions Officer – make clear that many students had been taking all online classes since Fall 2009.

36. Along with the letter, WANG submitted the various documents requested by SEVP, including sample HGU attendance and academic warning letters. A review of emails provided by one of HGU's officers who has been cooperating with ICE investigators reveals that the warning letters were newly fabricated. All typographical errors are in the originals.

37. On December 1, 2010, WANG emailed HGU's Vice President of Organizational Development, Richard Friberg: "Institution's attendance and academic warning letters do we have them? I know we have institution's attendance policy is in the catalog. But we never have academic warning letters. Can you create one?"

38. Friberg responded on December 2, 2010: "Jerry, I am not sure what this is for. Are there SEVIS rules that must be complied with? . . . . They are asking for these letters for a reason. Don't step in a trap." Friberg embedded into his email two sample letters. They are virtually identical to the Attendance Warning Letter and Academic Warning Letter that WANG submitted to SEVP two weeks later.

39. On December 3, 2010, WANG explained to Friberg the purpose of his request: "SEVP was asking me if student did not meet the full academic standing what does the school do. I said if student do not follow meet the full academic standing we will find out from our system and dismiss the student. SEVP said they want to see the academic warning letters to students."

40. Regarding the request for articulation agreements, WANG stated in his letter: "We submitted other articulation agreements to SEVP in 2008 and we are unable to locate additional copies to respond to this Request for Evidence. Now that we are a thriving institution and receive incoming transfer students from our competitor institutions, the same institutions are not willing to enter into articulation agreements with HGU or even to confirm in writing that they accept our credits when students transfer."

41. In June of 2012, I interviewed Mikhail Brodsky, the president of the Lincoln University in Oakland, California. Brodsky stated that in late 2010 or early 2011, an Asian family consisting of a husband, wife, and son, approached him at his Lincoln University office. According to Brodsky, the family told him that they were owners of HGU and attempted to bribe him for an articulation agreement, which he declined.

### F. Commingling of UEWM and HGU Foreign Students

42. In the course of my investigation, I have come upon evidence that UEWM was unilaterally enrolling students at HGU, without their knowledge. SEVIS shows that UEWM was approved to enroll foreign students in traditional Chinese medicine programs on August 6, 2003. In April 2007, SEVIS records reveal, UEWM began enrolling hundreds of F-1 students from

8

India; more than 390 such students were enrolled between April 2007 and HGU's I-17 approval on February 14, 2008. Although UEWM was authorized to enroll foreign students only in traditional Chinese medicine programs, it began enrolling many of these Indian students in business and science programs. In September 2008, SEVP moved to withdraw UEWM's approval to enroll foreign students, based in part on its enrolling foreign students in unauthorized programs. In October 2008, HGU obtained SEVP approval to enroll foreign students in an expanded degree program, including science, technology, engineering, and mathematics fields. UEWM immediately began transferring its Indian graduate students in such programs to HGU, leaving UEWM with no Indian students.

43. Based on my training and experience, I know that there is a high demand among foreign students, particularly foreign students from India, for United States graduate degrees in the fields of science, technology, engineering, and mathematics. SEVIS shows that the vast majority of foreign students enrolled at HGU are from India and are enrolled in such graduate programs. This demand comes largely from the fact that foreign students in such fields are eligible not only for immediate work authorization, but also for continued post-graduation work authorization for extended periods, under 8 C.F.R. § 214.2(f)(10)(i) and (ii)(C). There is much less demand among these foreign students for programs in traditional Chinese medicine.

44. In my interview of HGU employee Ling Zhang, Zhang advised that one of her duties was to clean up UEWM and HGU student files, which were a mess due to the crossover between UEWM and HGU students. Zhang stated that many Indian students who were issued UEWM I-20s were secretly transferred to HGU without their knowledge or consent. According to Zhang, many of these students wanted to stay at UEWM because it was accredited, and demanded to be transferred back to UEWM. HGU officials refused to issue transcripts to these students until they agreed to stop demanding to be transferred back to UEWM.

45. I have also learned from my investigation that HGU may have enrolled numerous foreign students before obtaining SEVP approval to do so. For example, SEVP received a letter postmarked November 8, 2007, stating:

> I, a current student at Herguan University, have been admitted to study for my Masters in Computer Engineering. After receiving I-20 it was stated from University of East-West Medicine as a medicine degree. I am worried about my visa status because I don't see Herguan University listed in your list to give out I-20. Also I see that University of East-West Medicine is listed. Are they allowed to give I-20 for another university? They keep saying everything is ok, but we don't know…I will keep myself anonymous due t any problems that I may receive regarding visa status…

Any I-20s issued by HGU prior to SEVP's approval for it to admit foreign students would be fraudulently created.

### G. Financial Investigation

46. My investigation has revealed that virtually all tuition revenue generated at HGU comes from foreign students. In WANG's signed and notarized letter to SEVP, dated December 16, 2010, WANG stated "pending accreditation, HGU attracts only international students . . . there is no good reason for a U.S. student to attend an institution of higher education in the United States until it become an accredited institution." The letter further stated that HGU charges "approximately $2,655 per semester." While HGU's Form I-17 and website confirm that the school has three terms per year, F-1 students are required to register for only two terms each year. SEVIS records show 626 F-1 students in active status at HGU. Thus, the expected tuition revenue for F-1 students is at least $3,324,060 per year.

47. I have reviewed records for Bank of America business checking account -1228, held in the name "Herguan University, Inc." These records show that the account had $10,426,756.54 in deposits and $10,236,907.41 in withdrawals between February of 2008 and September of 2011.

## V. ELECTRONIC EVIDENCE

### A. Background Information

48. I have consulted with experienced agents who have had training in the investigation of computer-related crimes. Based on my own training and experience, as well as the training and experience of other agents with whom I have consulted, I know the following:

49. Computer hardware, software, documentation, passwords, and data security devices may be important to a criminal investigation in two distinct respects: (1) the items themselves may be instrumentalities, fruits, and/or evidence of crime; and/or (2) items may have been used to collect and store information about crimes (in the form of electronic data).

50. Individuals who use computers or the Internet in furtherance of criminal activity often store, intentionally or unintentionally, evidence of the criminal activity on their computers and on digital storage media for an indefinite period of time. Computers often store data relating to a computer user's activity automatically and without the computer user's knowledge. It is often possible for a trained forensic examiner to recover evidence from computers and digital storage media even after an attempt has been made by the computer user to delete the evidence.

51. Electronic evidence can be stored and found on many forms of digital storage media. Traditional forms of digital storage media include, but are not limited to, floppy disk drives, hard disk drives, tape drives, "thumb" drives, CDs, or DVDs. In addition, there are now commonplace consumer electronic devices that can be connected to computers and used as digital storage media, including portable hard drives, mobile phones, handheld games or gaming consoles, organizers or personal digital assistants (PDAs), and cameras or video cameras, as well as memory cards that can be used in both computers and consumer electronic devices. Individuals engaging in criminal activity often attempt to hide information relating to the criminal activity by storing it in unusual or unexpected places. Therefore, as used herein, the