O 106 (Rev. 04/10) Application for a Search Warrant

# UNITED STATES DISTRICT COURT

for the

Northern District of California

In the Matter of the Search of )
**Google, Inc. email accounts:** )
**fei@herguanuniversity.org, fei@uewm.edu,** )  Case No.
**Richard@herguanuniversity.org,** )
**and Richard@uewm.edu;** )
**located at 1600 Amphitheater Parkway,** )
**Mountain View, CA 94043** )

**3 12 70062 JSC**

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

EMAIL ACCOUNTS: fei@herguanuniversity.org, fei@uewm.edu, Richard@herguanuniversity.org, and Richard@uewm.edu located on servers of Google, Inc. at 1600 Amphitheater Parkway, Mountain View, CA 94043, as described in Attachment A.

located in the     Northern     District of     California     , there is now concealed *(identify the person or describe the property to be seized)*:

Evidence, fruits, and/or instrumentalities of violations of 18 U.S.C. §§ 371; 1001 and 1546(a), as described in Attachment A.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

    ☑ evidence of a crime;

    ☐ contraband, fruits of crime, or other items illegally possessed;

    ☑ property designed for use, intended for use, or used in committing a crime;

    ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. §§ 371; 1001 | Conspiracy, False Statements to Government Agency, and Visa Fraud |
| 18 U.S.C. § 1546(a) | |

The application is based on these facts:

See attached Affidavit.

    ☑ Continued on the attached sheet.

    ☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested
     under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

Approved as to form:

HARTLEY M. K. WEST

_Applicant's signature_

Jason Mackey, Special Agent, DHS, ICE, HSI
_Printed name and title_

Sworn to before me and signed in my presence.

Date: 1-24-12

_Judge's signature_

City and state: San Francisco, CA

U.S. Magistrate Judge Jacqueline S. Corley
_Printed name and title_

AO 93 (Rev. 12/09) Search and Seizure Warrant

# UNITED STATES DISTRICT COURT

for the

Northern District of California

| | |
|---|---|
| In the Matter of the Search of | ) |
| | ) |
| Google, Inc. email accounts: fei@herguanuniversity.org, fei@uewm.edu, Richard@herguanuniversity.org, and Richard@uewm.edu; located at 1600 Amphitheater Parkway, Mountain View, CA 94043 | ) Case No. ) ) ) **3 12 7 0 0 6 2** ) |

## SEARCH AND SEIZURE WARRANT

**JSC**

To:    Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the _____Northern_____ District of _____California_____

*(identify the person or describe the property to be searched and give its location)*:
EMAIL ACCOUNTS: fei@herguanuniversity.org, fei@uewm.edu, Richard@herguanuniversity.org, and Richard@uewm.edu located on servers of Google, Inc. at 1600 Amphitheater Parkway, Mountain View, CA 94043, as described in Attachment A

The person or property to be searched, described above, is believed to conceal *(identify the person or describe the property to be seized)*:

Evidence, fruits, and/or instrumentalities of violations of 18 U.S.C. §§ 371; 1001 and 1546(a), as described in Attachment A.

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property.

**YOU ARE COMMANDED** to execute this warrant on or before _____Feb. 7, 2012_____

*(not to exceed 14 days)*

☑ in the daytime 6:00 a.m. to 10 p.m.    ☐ at any time in the day or night as I find reasonable cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to United States Magistrate Judge Jacqueline S. Corley

*(name)*

☐ I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*    ☐ for _____ days *(not to exceed 30)*.

☐ until, the facts justifying, the later specific date of _____ .

Date and time issued:    _1-24-12 3:06 p.m._    _Jacqueline S. Corley_

_Judge's signature_

City and state:    San Francisco, CA    U.S. Magistrate Judge Jacqueline S. Corley

_Printed name and title_

AO 93 (Rev. 12/09) Search and Seizure Warrant (Page 2)

| Return | | |
|---|---|---|
| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |
| Inventory made in the presence of : | | |
| Inventory of the property taken and name of any person(s) seized: | | |

### Certification

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: _____

_____
Executing officer's signature

_____
Printed name and title

**ATTACHMENT A**

## I.    SEARCH PROCEDURE

A.    In order to ensure that agents search only those computer accounts and/or files described herein, this affidavit and application for a search warrant seek authorization to permit employees of Google, Inc., located at 1600 Amphitheater Parkway, Mountain View, CA 94043, to assist agents in the service of the requested warrant. To further ensure that agents serving the warrant search only those computer accounts and/or files described in Attachment A, the following procedures will be used:

B.    The search warrant will be presented to Google personnel who will be directed to isolate those accounts and files described herein;

C.    In order to minimize any disruption of computer service to innocent third parties, Google employees and law enforcement personnel trained in the operation of computers will create an exact duplicate of the computer accounts described herein, including an exact duplicate of all information stored in computer accounts and files described herein;

D.    Google employees will provide the exact duplicate in electronic form of the accounts and files described herein and all information stored in those accounts and files to the agent who serves this search warrant;

E.    Law enforcement personnel with thereafter review the information stored in the accounts and files received from Google employees and then identify and copy the information contained in those accounts and files which are authorized to be further copied by this search warrant; and

F.    Law enforcement personnel will then seal the original duplicate of the accounts and files received from Google employees and will not further review the original duplicate absent an order from the Court.

## II.    FILES AND ACCOUNTS TO BE COPIED BY GOOGLE EMPLOYEES

A.    All electronic mail in the following accounts: fei@herguanuniversity.org, fei@uewm.edu, Richard@herguanuniversity.org, and Richard@uewm.edu;

B.    All existing printouts from original storage of all of the electronic mail described above in Section II(a);

C.    All transactional information of all activity of the electronic mail address and/or individual accounts described above in Section II(a) including log files, dates, times, methods of connecting, ports, dial-ups, and/or locations;

D.     All business records and subscriber information, in any form kept, pertaining to the electronic mail addresses and/or individual accounts described above in Section II(a), including applications, subscribers' full names, all screen names associated with the subscriber accounts, all account names associated with the subscribers, methods of payment, telephone numbers, addresses, and detailed billing records; and

E.     All records indicating the services available to the subscriber of the electronic mail address described above in Section II(a).

## III.     FILES AND ACCOUNTS TO BE FURTHER COPIED BY LAW ENFORCEMENT

A.     All email communications involving: Herguan University foreign (F-1) students; student tuition, recruitment, or referral payments; letters of acceptance or denial; grade sheets, transcripts, or attendance records; course materials or schedules; applications or authorizations to admit foreign students; Student Exchange and Visitor Program; Student and Exchange Visitor Information System; site visits or inspections; Designated School Officials; passports, visas, immigration status, travel records, or associated correspondence; records from banks or other financial institutions relating to accounts controlled by Herguan University, Jerry WANG, Ying Qiu WANG, Su Fang TONG, or Richard FRIBERG; tax records for Herguan University, Jerry WANG, Ying Qiu WANG, Su Fang TONG, or Richard FRIBERG; and U.S. immigration law and regulations.

B.     Existing printouts from original storage of all items mentioned in Section III(A); and

C.     All of the records and information described above in Sections II(C), (D), and (E).

**AFFIDAVIT IN SUPPORT OF**
**APPLICATION FOR SEARCH WARRANT**

I, Jason Mackey, being duly sworn, depose and state as follows:

### I. INTRODUCTION

1.     I make this affidavit in support of an application for a search warrant for accounts
controlled by the free, web-based, electronic mail ("email") service provider known as Google,
Inc., located at: 1600 Amphitheater Parkway, Mountain View, CA 94043.  The accounts to be
searched are: fei@herguanuniversity.org, fei@uewm.edu, Richard@herguanuniversity.org, and
Richard@uewm.edu (collectively, "SUBJECT ACCOUNTS").  The search procedure and items
to be seized are set forth in Attachment A.

2.     I respectfully submit that there is probable cause to believe that these accounts on
the Google computer systems contain electronic evidence of violations of 18 U.S.C. § 1546(a)
(Visa fraud), 18 U.S.C. § 1001 (False Statements to a Government Agency), and 18 U.S.C. § 371
(Conspiracy).

3.     The statements contained in this affidavit are based on my personal knowledge,
experience, background, and training, as well as on information provided by other law
enforcement personnel and other persons knowledgeable regarding the facts described below.
Because I submit this affidavit for the limited purpose of obtaining this search warrant, I have
not included every fact known to me concerning this investigation.  Rather, I have set forth only
those facts that I believe are necessary to establish probable cause.

### II. AGENT BACKGROUND

4.     I have been a Special Agent with the Department of Homeland Security ("DHS"),
Immigration and Customs Enforcement ("ICE"), Homeland Security Investigations ("HSI"), or
its predecessor agency, the United States Customs Service, since November 2002.  Since April

2009, I have been assigned to the Document and Benefit Fraud Task Force for the San Francisco, California, Office of the Special Agent in Charge. My previous assignments include the Joint Terrorism Task Force (2007-09), the Compliance Enforcement Unit (2006-07), the Benefit Fraud Unit (2004-06), and the Contraband Smuggling Group (2002-04).

5.       Since 2004, I have participated in at least 50 visa fraud investigations, three of which involved educational institutions, and have interviewed hundreds of aliens suspected of violating the U.S. immigration laws. I have been involved in over 25 search warrants, at least ten of which alleged visa fraud violations, and over 50 arrests for student visa violations.

6.       In addition to completing the Criminal Investigator Training Program and the Customs Basic Enforcement School at the Federal Law Enforcement Training Center (2003), I have received extensive training in enforcing U.S. immigration laws and investigating immigration benefit fraud schemes. , I have participated in the Customs-Immigration Cross Training Program (2004), ICE's National Security Investigations Western Region Training Conference (2008), and ICE's Document Fraud and Terrorism course (2010). I learned from these trainings about the common indicators of visa fraud and student visa status violations.

7.       I have also discussed this investigation with an ICE adjudicator assigned to the Student Exchange and Visitor Program ("SEVP") School Certification Branch, who has been involved in the inspections of at least 27 SEVP-approved schools. From these discussions, I know that all U.S. schools must file a petition and be approved by SEVP before they can sponsor foreign nationals to receive student status to enter and remain in the United States. SEVP approval is contingent upon a petitioning school's agreement to abide by certain regulations that require, among other things, reporting of foreign student residence addresses and failure of foreign students to maintain full courses of study. A school that does not comply with the

2

reporting requirements may have its sponsorship privileges revoked.

8.     As a result of this training and experience, I am familiar with the United States'
immigration laws and regulations, including those relating to student visas and status violations.
I am aware that an alien who has entered the United States on a valid student visa may become
removable if that alien fails to comply with the visa terms. I know that there is a very high
demand for student visas, and that some people seek such visas as a means of entry into the
United States without ever intending to pursue a full course of study. I also know that some
schools seek to profit from the demand for student visas by issuing visa-related documents and
falsely reporting students' status to DHS in exchange for "tuition" fees. Such schools are
typically not accredited, although they claim to be in the process of receiving accreditation, have
unusually low attrition rates, and lack reasonable facilities to accommodate student instruction.
Typically, the student populations of such schools are predominately foreign nationals, heavily
weighted toward a few ethnic groups due to the tendency to recruit by word of mouth (with
referral payments to current students).

### III.  APPLICABLE LAWS AND REGULATIONS

9.     Title 18, United States Code, Section 1546(a) makes it a criminal offense to
"knowingly forge[] . . . or falsely make[] any . . . document prescribed by statute or regulation
for entry into or as evidence of authorized stay . . . in the United States," or to "use[], attempt[] to
use, possess[], obtain[], accept[], or receive[]"any such document, "knowing it to be forged . . .
or falsely made, or to have been procured by means of any false claim or statement, or to have
been otherwise procured by fraud or unlawfully obtained." 18 U.S.C. § 1546(a).

10.     It is also a criminal offense to knowingly and willfully make a materially false or
fraudulent statement to a government agency. 18 U.S.C. § 1001.

3

11.     The Immigration and Nationality Act identifies several categories of foreign
nationals who may be admitted to the United States for non-immigrant purposes. See 8 U.S.C.
§ 1101. One such category, designated "F-1," comprises "bona fide student[s]" coming
temporarily to study at an approved school. 8 U.S.C. § 1101(a)(15)(F)(i); 8 C.F.R. § 214.1(a)(2).
Those entering the United States on an F-1 student visa are admitted for a temporary period
called "duration of status," meaning "the time during which an F-1 student is pursuing a full
course of study" at an approved school. 8 C.F.R. § 214.2(f)(5)(i). When a student stops
pursuing a full course of study, the duration of status ends and the temporary period for which
the individual was admitted expires.

12.     A school seeking approval to admit foreign students must submit a Petition for
Approval of School for Attendance by Nonimmigrant Student, also called a Form I-17, to SEVP
in Washington, DC. Through the I-17, the school must establish that (1) it is a bona fide school;
(2) it is an established institution of learning; (3) it has the necessary facilities, personnel, and
finances to instruct recognized courses; and (4) it actually is engaged in instructing those
courses. 8 C.F.R § 214.3(a)(3)(i). Petitioning schools that are not accredited must provide
additional documentation establishing either that its courses are equivalent to courses offered at
accredited schools or that they are accepted as fulfilling the requirements for the attainment of an
educational, professional, or vocational objective. 8 C.F.R § 214.3(c). In practice, this
documentation generally takes the form of transfer agreements with accredited schools and/or
letters from employers of the petitioning schools' graduates.

13.     The school's I-17 must identify Designated School Officials ("DSOs"), who
certify their knowledge of and intent to comply with student immigration laws and regulations. 8
C.F.R § 214.3(l). Once a school is approved, its DSOs are issued login IDs and passwords

4

enabling them to access the Student and Exchange Visitor Information System ("SEVIS") and use it to generate student visa related documents for their students. SEVIS is a nonpublic computer system located in Rockville, Maryland, which is used by the United States government and operated through SEVP for the purpose of collecting nonimmigrant student information from approved schools and monitoring such aliens' status.

### IV. BACKGROUND REGARDING COMPUTERS, THE INTERNET, AND EMAIL

14.     During this investigation, I have had conversations with HSI Special Agent Michael Brown, a Computer Forensics Agent who has been employed by HSI since 2003. Special Agent Brown has received training in digital data recovery and analysis from HSI as well as from various private vendors specializing in computer forensics. He has processed and analyzed digital evidence – including email evidence from Google – on a variety of cases including immigration fraud, export violations, intellectual property violations, child exploitation, and anti-narcotics enforcement. Based on my training, experience, and conversations with Special Agent Brown, I know the following.

### A.     The Internet and Internet Service Providers

15.     The Internet is a worldwide computer network that connects computers and allows communications and transfer of information and data across state and national boundaries. The Internet is commonly referred to as the World Wide Web ("www"), or shortened, the web. People can communicate on the Internet using email, as well as through specialized software enabling direct communications ("chat") and other means.

16.     People with Internet accounts and Internet-based email addresses must have a subscription, membership, or affiliation with an organization or commercial service that provides access to the Internet. A provider of Internet access and services is referred to as an Internet

5

Service Provider (ISP). ISPs maintain records pertaining to the individuals or companies that
have subscriber accounts with the ISP. Such records may include identifying and billing
information, account access information in the form of log files, email transaction information,
posting information, account application information, IP addresses, and other information both in
computer data format and in written record format.

**B.    Web Sites and IP Addresses**

17.    A "web page" is an electronic document, typically written in plain text in
computer language known as Hypertext Markup Language (HTML) and recognizable by most
computers capable of accessing the Internet. In many cases, a web page is publicly accessible by
anyone with a "web browser" and Internet access. A "web site" is a collection of related web
pages, images, videos, or other digital assets with a common "domain name" or "Internet
Protocol" (IP) address.

18.    "Internet Protocol" is the method by which data is sent from one computer to
another on the Internet. An IP address is a numerical label assigned to a computer or device that
is participating in an IP network. The IP address, in most cases, is assigned by a central
authority and identifies the location of the computer or server on which the data sought is
located. In sum, a "name" indicates what we seek; an "address" indicates where it is; a "route"
indicates how to get there.

19.    For various reasons, people can obfuscate the IP address of the server on which
their data resides, and thus render information derived from the IP address inaccessible to the
public. This is done through Domain Name System (DNS) Forwarding. DNS Forwarding
results in the display of a forwarder's server as the target IP address, rather than the server on
which the data actually resides. When queries for a web page are received, they are internally

6

and privately forwarded to another IP address, normally without any notice or indication to the viewer. Information related to the actual IP address of a web site is only available through a legal request, such as a subpoena.

## C.    Email Communications

20.    Email is an electronic form of communication that usually contains written correspondence, and may also be contain as attachments computer files in any form including pictures, video files and electronic documents. It is similar to conventional paper mail in that it is addressed from one individual to another and is usually considered private. An email usually contains a message "header," which generally displays the sender's email address, the recipient's email address, and the date and time of the email transmission. A sender can choose to type a subject line into the header. Email message headers usually contain information, such as identification of the sender's ISP, which enables law enforcement to trace the message back to the original sender. To do so, information must be obtained from the sender's ISP through a grand jury subpoena.

21.    Email message headers also may include information about the sender of the email, including the IP address of the sender, the type of software utilized to create and send the message, the route through which the message arrived at the recipient's mailbox, and date and time stamps for receipt. In certain cases, additional information such as the computer name (given by its owner or administrator) is included within the headers.

22.    Email is often the preferred medium for international communication in much, if not most, of the business world. Email is instantaneous, the communication is committed to writing, and differences in times zones matter less due to the fact that the email recipient does not have to be physically present at work when the email message is sent.

7

26.     A Google subscriber can store files, including emails and image files, on servers maintained and/or owned by Google. Emails and image files stored on a Google server by a subscriber may not necessarily also be located in the subscriber's home computer. The subscriber may store emails and/or other files on the Google server for which there is insufficient storage space in the subscriber's own computer or which the subscriber does not wish to maintain in his or her own computer. A search of the subscriber's home, business, or laptop computer will therefore not necessarily uncover files the subscriber has stored on the Google servers.

### V. STORED WIRE AND ELECTRONIC COMMUNICATIONS ACCESS

27.     Title 18, United States Code, Sections 2701 through 2711, is entitled "Stored Wire and Electronic Communications and Transactional Records Access."

      a.     Title 18, United States Code, Section § 2703(a) provides, in part:

A governmental entity may require the disclosure by a provider of electronic communication service of the contents of an electronic communication, that is in electronic storage in an electronic communications system for one hundred and eighty days or less, only pursuant to a warrant issued under the Federal Rules of Criminal Procedure or equivalent State warrant. A governmental entity may require the disclosure by a provider of electronic communications services of the contents of an electronic communication that has been in electronic storage in an electronic communications system for more than one hundred and eighty days by the means available under subsection (b) of this section.

      b.     Title 18, United States Code, Section § 2703(b) provides, in part:

(1) A governmental entity may require a provider of remote computing service to disclose the contents of any electronic communication to which this paragraph is made applicable by paragraph (2) of this subsection -

      (A) without required notice to the subscriber or customer, if the governmental entity obtains a warrant issued under the Federal Rules of Criminal Procedure or equivalent State warrant . . .

(2) Paragraph (1) is applicable with respect to any electronic communication that is held or maintained on that service -

(A) on behalf of, and received by means of electronic transmission from (or created by means of computer processing of communications received by means of electronic transmission from), a subscriber or customer of such remote computing service; and

(B) solely for the purpose of providing storage or computer processing services to such subscriber or customer, if the provider is not authorized to access the contents of any such communications for purposes of providing any services other than storage or computer processing.

c.     The government may also obtain records and other information pertaining

to a subscriber to or customer of electronic communication service or remote

computing service by way of a search warrant.  18 U.S.C. § 2703(c).  No notice to

the subscriber or customer is required.  *See* 18 U.S.C. § 2703(c)(2).

d.     Title 18, United States Code, Section § 2711, provides, in part:

As used in this chapter -

(1) the terms defined in section 2510 of this title have, respectively, the definitions given such terms in that section; and

(2) the term "remote computing service" means the provision to the public of computer storage or processing services by means of an electronic communications system.

e.     Title 18, United States Code, Section § 2510, provides, in part:

(8) "contents," when used with respect to any wire, oral, or electronic communication, includes any information concerning the substance, purport, or meaning of that communication; . . .

(14) "electronic communications system" means any wire, radio, electromagnetic, photo optical or photo electronic facilities for the transmission of electronic communications, and any computer facilities or related electronic equipment for the electronic storage of such communications; . . .

(15) "electronic communication service" means any service which provides to users thereof the ability to send or receive wire or electronic communications; . . .

10

(17) "electronic storage" means –

(A) any temporary, intermediate storage of a wire or electronic communication incidental to the electronic transmission thereof; and

(B) any storage of such communication by an electronic communication service for purposes of backup protection of such communication.

f.   Title 18, United States Code, Section 2703(g) provides, in part:

Notwithstanding section 3105 of this title, the presence of an officer shall not be required for service or execution of a search warrant issued in accordance with this chapter requiring disclosure by a provider of electronic communications service or remote computing service of the contents of communications or records or other information pertaining to a subscriber to or customer of such service.

### VI. SUMMARY OF PROBABLE CAUSE

#### A.   Background

28.   Herguan University ("HU") is located in Sunnyvale, California. According to its website, HU purports to be an "industry driven university" with a mission to "expand the understanding and application of the latest research in business, engineering, science, electronics or medical management practices." Ying Qui WANG ("YQ WANG") is president and owner of HU. His wife, Su Fang TONG ("TONG"), and their son, Jerry WANG ("J WANG"), are both co-owners.

29.   YQ WANG also owns the University of East West Medicine ("UEWM") which was established in 1999 and offers courses in traditional Chinese medicine. UEWM shares its campus with HU. While UEWM has been accredited by the Accreditation Commission for Acupuncture and Oriental Medicine since May 2005, HU remains unaccredited. The WANG family also owns several other businesses that are affiliated with UEWM, including the International Institutes for Health and Healing ("IIHH"), a traditional Chinese medicine research entity, and Vital Core Biosystem, Inc., a supplier of traditional Chinese medicine equipment.

11

**B.    HU's False Form I-17 and Attachments**

   (1)    The I-17

   30.    On July 6, 2007, YQ WANG electronically submitted a Form I-17 to SEVP in
Washington, DC, seeking approval to admit foreign students. YQ WANG submitted a hard-copy
I-17 dated July 10, 2007, signed by himself and by J Wang as HU's Primary Designated School
Official. HU's I-17 stated that HU was established on December 12, 2005. Several documents
submitted by YQ WANG in support of the I-17 reference student enrollment at HU between Fall
2005 and Spring 2007.

   31.    In January 2012, I spoke with Leeza Rifredi, Licensing Manager for the
California Bureau for Private Postsecondary Education (BPPE), the entity that licenses private
postsecondary schools to operate. YQ WANG submitted a license application to BPPE for HU
on May 30, 2006. The application states that "there are no students enrolled. Once we believe
we are ready to open the school we would like to think there will be 20-25 students in each
program." (All quotations in this affidavit are verbatim, including typographical and
grammatical errors.) BPPE issued HU's license to operate on June 5, 2007 – the day before HU
submitted its I-17.

   32.    The date of HU's establishment is material, as a school cannot obtain I-17
approval without showing that it is a bona fide school, an established institution of learning, and
actually engaged in course instruction. See 8 C.F.R § 214.3(a)(3)(i). SEVP clarifies these
requirements on its website describing the I-17 process: "[B]efore a school applies, it [m]ust
have already opened its doors and begun instructing students in the courses/programs for which
it is seeking approval. . . . [It w]ill have had to graduate students before applying or be accredited
by a nationally recognized accrediting agency." www.ice.gov/doclib/sevis/pdf/i17_process.pdf.

12

### (2) Supplemental Filings

33.     On August 8, 2007, having received HU's I-17 petition, SEVP sent HU an electronic request for employment letters. Specifically, SEVP sought letters from employers of recent HU graduates attesting that "graduates of [HU] are fully qualified in their field of study, as a result of the training they gained at [HU]," and/or letters from accredited schools that "have accepted, and continue to accept unconditionally, credits from [HU]." J WANG responded with three fraudulent employment letters – all from companies owned and operated by the WANG family – and two fraudulent letters from accredited schools.

### (a)     UEWM Employment Letter

34.     On August 16, 2007, SEVP received a letter from UEWM signed by "Alex Shi, Clinic Manger," stating: "Candace Zheng graduated from HU in April 15th, 2007 major in Master of Science in Traditional Chinese Medicine and is hired by us as herbal consultant/ manager assistant in May 1st, 2007. Candace Zheng in Fully qualified in his field of study as a result of the training he gained at HU and is doing outstanding in his position." Attached to the letter were transcripts bearing Zheng's name, date of birth, social security number, and address, and showing that she attended HU from Fall 2005 through her graduation on April 15, 2007.

35.     UEWM's website confirms that it is owned by YQ Wang.

36.     I interviewed Candace Zheng, a/k/a Candace Luo, in September 2011. Luo confirmed the biographical data on the transcripts and but advised that she did not attend or graduate from HU. She stated that she had, however, attended UEWM from December 2006 to December 2008, and she knew UEWM was co-located with HU. Luo said that she worked for the UEWM clinic as a receptionist.

13

37.     I interviewed Alex Shi, a/k/a ChengGuang Shi, in September 2011. Shi advised that he worked at UEWM as an academic dean and clinic employee, and that J WANG was his supervisor. Shi confirmed that Zheng had worked at the UEWM clinic, but could not recall whether he supervised her or what her position was. He did not recall signing the letter, but admitted having signed many documents at UEWM without reading them first.

(b)     IIHH Employment Letter

38.     On August 16, 2007, SEVP received a letter from IIHH signed by "Lin Lee, President," stating: "In April 20th, 2007, IIHH hired David Wang as Herbal Researcher, with his excellent training from HU make him fully qualified in this position. David Wang graduated from HU in April 15th 2007, and earned his Master of Science in Traditional Chinese Medicine degree." The letter provided a contact phone number of 510-585-7953 for both Lin Lee and IIHH. Attached to the letter were transcripts bearing Wang's name, date of birth, social security number, and address, and showing that he attended HU from Fall 2005 through his graduation on April 15, 2007.

39.     IIHH's corporate filings identify YQ WANG as a director.

40.     I interviewed Lin Lee, a/k/a Ling Li, in September 2011. Li stated that she worked as the dean of admissions for UEWM in 2007, and that J WANG was her supervisor. Li said she had never heard of IIHH, never worked for IIHH, and does not know David Wang. Li said she has never used the name Lin Lee, but confirmed that the signature resembled hers and that the contact number was that of her personal cellular phone. I have subpoenaed records for this phone number, which confirm that it was subscribed to by Ling Li in 2007.

41.     I have not yet located or interviewed David Wang.

14

(c)     Vital Care Biosystem Employment Letter

42.     On February 14, 2008, SEVP received a letter from Vital Core, signed by "JingGang Tang, Manager," stating: "Shane Guan graduated from HU on April 15th 2007. Shane Guan has been demonstrating outstanding performance from the beginning of his employment due to his knowledge and competent qualifications in the field marketing after completing his training at HU." Attached to the letter were HU transcripts for Guan bearing his name, date of birth, social security number, and address, and showing that he attended HU from Fall 2005 through his graduation on April 15, 2007.

43.     Vital Core's corporate fillings identify J Wang as its Chief Executive Officer.

44.     I interviewed JingGang Tang in September 2011. Tang confirmed that he worked for Vital Core and that J WANG was his supervisor. Tang advised that J WANG wrote the entire letter, telling him that it was to be used as a reference letter for a friend looking for a job. Tang admitted that he signed the letter without reading it because he felt pressured by his supervisor. He said that he did not know Guan, and that Guan never worked for him.

45.     I also interviewed Guan in September 2011. Guan confirmed the biographical data on the transcripts but stated that he never heard of Vital Core and never worked there. Guan advised that he did not recall ever attending or graduating from HU, but said he was currently attending and pursuing a degree at UEWM, which he knows to be co-located with HU.

(d) ACCHS Accreditation Letter

46.     The Academy of Chinese Culture and Health Sciences ("ACCHS") is a school offering courses in traditional Chinese medicine, located in Oakland, California. ACCHS is accredited by the Accreditation Commission from Acupuncture and Oriental Medicine. On February 14, 2008, SEVP received a letter signed by "Andres Bella, Director of Institutional

15

Relations" of ACCHS. The letter stated that "in summer of 2007, Ms Li Ling was admitted and enrolled at ACCHS . . . from HU. Upon this student's matriculation into our program we awarded her transfer credit for the coursework completed at HU. ACCHS unconditionally accepts and has accepted credit from HU."

47.     I interviewed Andres Bella in September of 2011. Bella denied having written or signed the letter, stating that he would not provide such a letter because he knows that HU is not accredited. Bella further stated that he does not know a Li Ling, and was not aware of her having transferred into or otherwise attended ACCHS.

48.     I believe that Li Ling may refer to Ling Li, UEWM's dean of admissions. Li stated in her September 2011 interview that she never took courses at HU, and never transferred to or attended ACCHS.

(e)     UEWM Accreditation Letter

49.     On February 14, 2008, SEVP received another letter from UEWM, signed "Chengguang Shi, Academic Dean"; Chengguang Shi is also known as Alex Shi, the signatory on UEWM's employment letter. This letter stated: "UEWM is accredited by the Accreditation Commission from Acupuncture and Oriental Medicine. . . . In summer 2007, Ms Su Tong was admitted and enrolled at UEWM in the Master of Science program as a transfer student from HU. Upon this students matriculation into our program we awarded her transfer credit for the coursework completed at HU. UEWM unconditionally accepts and has accepted credit from HU." Su TONG is YQ WANG's wife, J WANG's mother, and co-owner of HU and UEWM.

50.     Shi stated in his September 2011 interview that, as academic dean of UEWM, TONG was one of his supervisors. As with the UEWM employment letter, Shi did not recall signing the accreditation letter, but knew he signed many documents without reading them first.

16

Shi did not recall TONG being enrolled as a student at UEWM.

      (3)    SEVP Email

    51.    On January 14, 2008, SEVP sent HU an electronic request for additional details about HU's academic facilities and physical capacity. On January 14, 2008, J WANG responded to SEVP by email from fei@uewm.edu. In the email, J WANG stated that HU had three classrooms, and that "all 3 classrooms is used for instruction. The maximum capacity for classroom A is 24 students, B is 20 students, C is 16 students. Sincerely, Jerry Wang."

## C.    The Site Visit

    52.    HU's I-17 was approved on February 14, 2008. By November 2010, the SEVIS databases showed that HU had over 900 F-1 foreign students enrolled. On November 11, 2010, SEVP employees and HSI agents visited HU and interviewed J WANG to determine HU's compliance with the SEVP regulations. Agents observed that most of HU's facilities were under construction and not fit for conducting classes. Although the site visit was conducted at a time that HU classes were scheduled, agents did not observe a single HU student on campus. J WANG nonetheless insisted that more than 900 F-1 students were physically attending classes at the HU facility.

    53.    As part of the visit, SEVP asked J WANG several questions relating to his duties as a DSO. When asked what action HU takes if a student is not making academic progress, J WANG responded that such a student is put on academic probation and issued academic warning letters. J WANG advised that HU's faculty takes attendance, and that school policy allows three absences from any particular course. When asked about the school's response when a student fails to attend class, J WANG advised that HU terminates such students' status in SEVIS and assigns an "F" to any student who accumulates three absences in any one course.

17

54.     After the November 11, 2010 Site Visit, SEVP issued a request for copies of attendance records and academic warning letters. J WANG formerly responded in writing to this request on December 16, 2010, explaining that HU allowed its students to enroll in "simultaneous broadcasting" (online) classes for the Fall 2010 semester due to the school's renovations. J WANG attached to his letter copies of HU's attendance records and academic warning letters.

**D.     Dean Martinez**

55.     On December 8, 2010, HU's Dean of Academic Affairs, Dr. Anthony Martinez, contacted SEVP by email, expressing concerns about HU's truthfulness with SEVP personnel, its violation of SEVIS regulations, and its admission of students whom HU officials seldom see. HSI agents interviewed Martinez on December 15, 2010. Martinez stated that he had information about several HU employees, including J WANG and HU's Vice President, Richard FRIBERG. Martinez provided agents with several emails on which he had been copied, reflecting J WANG's and FRIBERG's attempts to conceal facts from SEVP.

56.     A December 1, 2010 email to FRIBERG from J WANG at fei@uewm.edu states: "Institution's attendance and academic warning letters do we have them? I know we have institution's attendance policy is in the catalog. But we never have academic warning letters. Can you create one? Jerry." FRIBERG responded on December 2, 2010, from email account Richard@uewm.edu, asking if J WANG's request was related to SEVIS regulations. FRIBERG advised: "You create a trap for yourself because they could come in and go through the student records and find out how you have not dropped students for 3 absences or have not put students on probation for SAP." He continued: "They are asking for these letters for a reason. Don't step in a trap."

18

57.     On December 3, 2010, J WANG responded to FRIBERG from email account
fei@uewm.edu: "SEVP was asking me if student did not meet the full academic standing what
does the school do. I said if student do not follow meet the full academic standing we will find
out from our system and dismiss the student. SEVP said they want to see the academic warning
letters to the students." FRIBERG answered from email account Richard@uewm.edu on
December 5, 2010: "I would NOT send them a letter specifically designed just for them because
that would be obvious that you just created it for them and not one that you regularly use."

58.     A December 5, 2010 email to J WANG from FRIBERG at Richard@uewm.edu
states: "On November 22, when you told me about the SEVP visit, I advised you to make sure
you dropped all students that were non attenders if you had any. . . . You need to take action. It
is the non atttenders and the people that are taking advantage of their visas that are going to
cause the most trouble for you with SEVP. These people are not defendable. There is no reason
for them to have a visa. GET RID OF THEM FAST if you have not already."

59.     Finally, I have also reviewed a December 2, 2010 email from Martinez to J
WANG at fei@herguanuniversity.org and FRIBERG at Richard@herguanuniversity.org. In this
email, Martinez advised that he had been contacted by a student who stated that he enrolled at
HU in January 2010 based on representations that the school was "fully-online" and that he was
"never going to have to come to campus."

### VII. CONCLUSION

60.     Based upon the foregoing, I believe there is probable cause that the SUBJECT
ACCOUNTS contains evidence, fruits, and instrumentalities of violations of 18 U.S.C. § 1546(a)
(Visa fraud), 18 U.S.C. § 1001 (False Statements to a Government Agency), and 18 U.S.C. § 371
(Conspiracy). More specifically, I believe that the Google email accounts

19

fei@herguanuniversity.org, fei@uewm.edu, Richard@herguanuniversity.org, and

Richard@uewm.edu contain communications documenting a conspiracy by J WANG, YQ

WANG, and others to make materially false statements to HSI agents and to SEVP in connection

with HU's petition to admit foreign students. By this affidavit and application, I request that the

Court issue a search warrant directed to Google, allowing agents to seize email and other

information stored on Google's servers, as set forth in Attachment A.

## VIII. REQUEST FOR SEALING

61.     Because this investigation is continuing, disclosure of this affidavit, the

application for search warrant, search warrant, and the attachments thereto will jeopardize the

progress of the investigation. Specifically, disclosure may cause persons or entities to destroy or

hide evidence and to take countermeasures to defeat investigation and prosecution in future unlawful

activities. Accordingly, I request that the Court order that this affidavit, the application for

search warrant, search warrant, and the attachments thereto be filed under seal until further order

of this Court.

Jason Mackey, Special Agent
Department of Homeland Security
Homeland Security Investigations

Sworn to and subscribed before me this 24th day of January, 2012.

HON. JACQUELINE SCOTT CORLEY
United States Magistrate Judge

20

**ATTACHMENT A**

## I.    SEARCH PROCEDURE

A.    In order to ensure that agents search only those computer accounts and/or files described herein, this affidavit and application for a search warrant seek authorization to permit employees of Google, Inc., located at 1600 Amphitheater Parkway, Mountain View, CA 94043, to assist agents in the service of the requested warrant. To further ensure that agents serving the warrant search only those computer accounts and/or files described in Attachment A, the following procedures will be used:

B.    The search warrant will be presented to Google personnel who will be directed to isolate those accounts and files described herein;

C.    In order to minimize any disruption of computer service to innocent third parties, Google employees and law enforcement personnel trained in the operation of computers will create an exact duplicate of the computer accounts described herein, including an exact duplicate of all information stored in computer accounts and files described herein;

D.    Google employees will provide the exact duplicate in electronic form of the accounts and files described herein and all information stored in those accounts and files to the agent who serves this search warrant;

E.    Law enforcement personnel with thereafter review the information stored in the accounts and files received from Google employees and then identify and copy the information contained in those accounts and files which are authorized to be further copied by this search warrant; and

F.    Law enforcement personnel will then seal the original duplicate of the accounts and files received from Google employees and will not further review the original duplicate absent an order from the Court.

## II.    FILES AND ACCOUNTS TO BE COPIED BY GOOGLE EMPLOYEES

A.    All electronic mail in the following accounts: fei@herguanuniversity.org, fei@uewm.edu, Richard@herguanuniversity.org, and Richard@uewm.edu;

B.    All existing printouts from original storage of all of the electronic mail described above in Section II(a);

C.    All transactional information of all activity of the electronic mail address and/or individual accounts described above in Section II(a) including log files, dates, times, methods of connecting, ports, dial-ups, and/or locations;

D.      All business records and subscriber information, in any form kept, pertaining to the electronic mail addresses and/or individual accounts described above in Section II(a), including applications, subscribers' full names, all screen names associated with the subscriber accounts, all account names associated with the subscribers, methods of payment, telephone numbers, addresses, and detailed billing records; and

E.      All records indicating the services available to the subscriber of the electronic mail address described above in Section II(a).

## III.    FILES AND ACCOUNTS TO BE FURTHER COPIED BY LAW ENFORCEMENT

A.      All email communications involving: Herguan University foreign (F-1) students; student tuition, recruitment, or referral payments; letters of acceptance or denial; grade sheets, transcripts, or attendance records; course materials or schedules; applications or authorizations to admit foreign students; Student Exchange and Visitor Program; Student and Exchange Visitor Information System; site visits or inspections; Designated School Officials; passports, visas, immigration status, travel records, or associated correspondence; records from banks or other financial institutions relating to accounts controlled by Herguan University, Jerry WANG, Ying Qiu WANG, Su Fang TONG, or Richard FRIBERG; tax records for Herguan University, Jerry WANG, Ying Qiu WANG, Su Fang TONG, or Richard FRIBERG; and U.S. immigration law and regulations.

B.      Existing printouts from original storage of all items mentioned in Section III(A); and

C.      All of the records and information described above in Sections II(C), (D), and (E).