AO 93 (Rev. 12/09) Search and Seizure Warrant



# UNITED STATES DISTRICT COURT

for the

Northern District of California

In the Matter of the Search of )
)
**Administrative Offices of Herguan University and** ) Case No. **1 2 - 7 0 8 6 0** PSG
**the University of East-West Medicine, located at** )
**595 Lawrence Expressway, Sunnyvale, California** )
)

## SEARCH AND SEIZURE WARRANT

To:     Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search
of the following person or property located in the _____Northern_____ District of _____California_____
*(identify the person or describe the property to be searched and give its location):*
Administrative Offices of Herguan University and the University of East-West Medicine, located at 595 Lawrence
Expressway, Sunnyvale, California, as described in Attachment A.

The person or property to be searched, described above, is believed to conceal *(identify the person or describe the
property to be seized)*:
Evidence, fruits, and/or instrumentalities of violations of 18 U.S.C. §§ 2; 371; 1001(a)(3); 1028A; 1030(a)(3); 1546(a),
as described in Attachment B.

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or
property.

**YOU ARE COMMANDED** to execute this warrant on or before      8·13·17
                                                                                          *(not to exceed 14 days)*

☑ in the daytime  6:00 a.m. to 10 p.m.          ☐ at any time in the day or night as I find reasonable cause has been
                                                                    established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property
taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the
place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an
inventory as required by law and promptly return this warrant and inventory to United States Magistrate Judge
Paul S. Grewal                                         .
                        *(name)*

☐ I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay
of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be
searched or seized *(check the appropriate box)*   ☐ for _____ days *(not to exceed 30).*

                                                                ☐ until, the facts justifying, the later specific date of _____ .

Date and time issued:   7·31·12  ;  3 PM                 pes            _____
                                                                                                       *Judge's signature*

City and state:     San Jose, CA                                   U.S. Magistrate Judge Paul S. Grewal
                                                                                  *Printed name and title*

AO 93 (Rev. 12/09) Search and Seizure Warrant (Page 2)

| Return | | |
|---|---|---|
| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |

Inventory made in the presence of :

Inventory of the property taken and name of any person(s) seized:

## Certification

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: _____

_____
Executing officer's signature

_____
Printed name and title

## ATTACHMENT A

ADMINISTRATIVE OFFICES OF HERGUAN UNIVERSITY AND THE UNIVERSITY OF EAST-WEST MEDICINE LOCATED AT 595 LAWRENCE EXPRESSWAY, SUNNYVALE, CALIFORNIA



595 Lawrence Expressway is a two-story commercial structure located at the intersection of Lawrence Expressway and Oakmead Parkway in Sunnyvale, CA. Located inside are classrooms and the offices of Herguan University and University of East West Medicine. The offices include a registrar office, finance office, and offices of Jerry WANG, Ying WANG, and Su TONG. The numbers "595" appear on the Northeast top corners of the building. A large sign reading "Herguan University" is located above the front entrance of the building on the top east side. A sign reading "University of East West Medicine" is located on the top north side of the building, and a sign reading "Medical Center University of E W Medicine" is located on the top west side of the building. The front entrance is located under the "Herguan University" sign. A rear door is located below the "Medical Center University of E W Medicine" sign. Numerous side doors are located on both the north and south sides.

## ATTACHMENT B

### ITEMS TO BE SEIZED

All items and records which constitute evidence, fruits, or instrumentalities of violations of 18 U.S.C. § 371 (Conspiracy to Commit Visa Fraud); 18 U.S.C. § 1546(a) (Visa Fraud); 18 U.S.C. § 1030(a)(3) (Unauthorized Access to a Government Computer); 18 U.S.C. § 1001(a)(3) (Use of False Documents); 18 U.S.C. § 1028A (Aggravated Identity Theft); and 18 U.S.C. § 2 (Aiding and Abetting) as identified below.

As used in this Attachment, the term "records" includes all of the items described in whatever form and by whatever means they may have been created and/or stored. This includes any handmade, photographic, mechanical, electrical, electronic, paper, digital, and/or magnetic forms. It also includes items in the form of computer hardware, software, documentation, passwords, e-mail, and/or data security devices.

The items and records to be seized from the SUBJECT PREMISES (described in Attachment A) include:

1.  Records related the acquisition and maintenance of foreign student ("F-1") status for current and former foreign HERGUAN UNIVERSITY (HGU) and UNIVERSITY OF EAST-WEST MEDICINE (UEWM) students and applicants for the period between July 6, 2007, and the present, including visa applications, Forms I-20, Student an Exchange Visitor Information System (SEVIS) manuals and printouts, admissions applications and supporting documents, letters of acceptance/denial, supporting financial records, records of tuition and fee payments, attendance records, transcripts, diplomas, and records of any courses currently and previously held;

2.  Records related to HGU and UEWM's authorization to admit foreign nationals, including Forms I-17 and I-17A, and all supplemental documentation in support of those applications, including transfer letters, articulation agreements, employment letters, employment and academic records related to individuals named in such documents, payments related to the acquisition of transfer letters or articulation agreements, and correspondence related to the acquisition and filing of such documents;

3.  Applications, attendance sheets, and transcripts for Candace Zheng, Shane Guan, and David Wang.

4.     Travel records related to Jerry WANG, Su Tong, and Ying Wang for the period
       between February 14, 2008, and the present, including passports, visas, airline
       tickets, boarding passes, and airline ticket receipts;

5.     Address books, telephone lists and directories, and telephone records for Jerry
       WANG, Su Tong, and Ying Wang, between July 6, 2007, and the present;

6.     Financial records related to HGU, UEWM, Vital Core Biosystems, Inc.;
       International Institutes for Health and Healing; Jerry WANG, Su Tong, and Ying
       Wang, for the period between July 6, 2007, and the present, including but not
       limited to tax records, investment account records, bank account records, account
       applications, account statements, signature cards, withdrawal slips, debit and
       credit memos, checkbooks, deposit slips, canceled checks, client checks, cashier's
       checks, financial statements, wire transfer records, wiring instructions, loan
       records, and credit reports;

7.     Title, deed, escrow, lease, or other records for property purchased or leased by
       Jerry WANG, Su Tong, Ying Wang, HGU, or UEWM, for the period between
       February 14, 2008, and the present;

8.     Money orders, personal checks, cashier's checks, credit card receipts, and other
       receipts relating to or constituting proceeds from the production or filing of
       fraudulent visa applications or visa-related forms, or relating to or constituting
       payments from foreign nationals for the maintenance of immigration status, for
       the period between February 14, 2008, and the present;

9.     Items, documents, and effects showing residency and/or dominion and control of
       the place to be searched, including but not limited to keys, receipts, bills, canceled
       checks, mail envelopes, rental agreements, telephone records and bills, utility
       bills, and internet/cable provider statements for the period between July 6, 2007,
       and the present;

10.    Computer equipment and/or storage devices used to create or store the items, data,
       or records referenced in the paragraphs of this Attachment, pursuant to the
       protocol set forth in Attachment C; and

11.    Passwords, password files, test keys, encryption codes, operating manuals, and
       other information necessary to access the computer equipment, storage devices or
       data, as limited by Attachment C.

United States District Court for the Northern District of California

### PROTOCOL FOR SEARCHING DEVICES OR MEDIA THAT STORE DATA ELECTRONICALLY

THIS PROTOCOL WILL BE ATTACHED TO EACH SEARCH WARRANT THAT AUTHORIZES A SEARCH OF ANY DEVICE OR MEDIA THAT STORES DATA ELECTRONICALLY

It Also Will Be Incorporated, At Least As An Attachment, in the Affidavit Supporting the Warrant

1.    In executing this warrant, the government will begin by ascertaining whether all or part of a search of a device or media that stores data electronically ("the device") reasonably can be completed at the location listed in the warrant ("the site") within a reasonable time. If the search reasonably can be completed on site, the government will remove the device from the site only if removal is necessary to preserve evidence, or if the item is contraband, a forfeitable instrumentality of the crime, or the fruit of a crime.

2.    If the government determines that a search reasonably cannot be completed on site within a reasonable time period, the government must determine whether all or part of the authorized search can be completed by making a mirror image of, or in some other manner duplicating, the contents of the device and then conducting the forensic review of the mirror image or duplication off site. The government will complete a forensic review of that mirror image within 120 days of the execution of the search warrant.

3.    In a circumstance where the government determines that a mirror image of the contents of a device cannot be created on site in a reasonable time, the government may seize and retain that device for 60 days in order to make a mirror image of the contents of the device.

4.    When the government removes a device from the searched premises it may also remove any equipment or documents ("related equipment or documents") that reasonably appear to be necessary to create a mirror image of the contents of the device or conduct an off-site forensic review of a device.

5.     When the government removes a device or related equipment.or documents from the site in order to create a mirror image of the device's contents or to conduct an off-site forensic review of the device, the government must file a return with a magistrate judge that identifies with particularity the removed device or related equipment or documents within 14 calendar days of the execution of the search warrant.

6.     Within a reasonable period of time, but not to exceed 60 calendar days after completing the forensic review of the device or image, the government must use reasonable efforts to return, delete, or destroy any data outside the scope of the warrant unless the government is otherwise permitted by law to retain such data.

7.     The time periods set forth in this protocol may be extended by court order for good cause.

8.     In the forensic review of any device or image under this warrant the government must make reasonable efforts to use methods and procedures that will locate and expose those categories of files, documents, or other electronically-stored information that are identified with particularity in the warrant, while minimizing exposure or examination of irrelevant, privileged, or confidential files. to the extent reasonably practicable.

9.     For the purposes of this search protocol, the phrase "to preserve evidence" is meant to encompass reasonable measures to ensure the integrity of information responsive to the warrant and the methods used to locate same.

AO 106 (Rev. 04/10) Application for a Search Warrant

# UNITED STATES DISTRICT COURT

for the

Northern District of California



In the Matter of the Search of

**Administrative Offices of Herguan University and
the University of East-West Medicine, located at
595 Lawrence Expressway, Sunnyvale, California**

Case No.

**12 - 70860**



## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:
Administrative Offices of Herguan University and the University of East-West Medicine, located at 595 Lawrence Expressway, Sunnyvale, California, as described in Attachment A.

located in the _____ Northern _____ District of _____ California _____, there is now concealed *(identify the person or describe the property to be seized)*:
Evidence, fruits, and/or instrumentalities of violations of 18 U.S.C. §§ 2; 371; 1001(a)(3); 1028A; 1030(a)(3); 1546(a), as described in Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| **18 U.S.C. §§ 2; 371;** | Aiding and Abetting, Conspiracy to Commit Visa Fraud, Use of False Documents, |
| **18 U.S.C. §§ 1001(a)(3); 1028A;** | Aggravated Identity Theft, Unauthorized Access to a Government Computer, and |
| **18 U.S.C. §§ 1030(a)(3); and 1546(a)** | Visa Fraud |

The application is based on these facts:

See attached Affidavit.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested
under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

Approved as to form:

HARTLEY M. K. WEST

*Applicant's signature*

Jason G. Mackey, Special Agent, DHS, ICE, HSI
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 7-31-12

*Judge's signature*

City and state: San Jose, CA

U.S. Magistrate Judge Paul S. Grewal
*Printed name and title*

## AFFIDAVIT

I, Jason Mackey, being first duly sworn, hereby depose and state as follows:

### I. INTRODUCTION

1.      I make this affidavit in support of an application for a search and seizure warrant for the Administrative Offices of HERGUAN UNIVERSITY (HGU) and the UNIVERSITY OF EAST-WEST MEDICINE (UEWM) (collectively, the "SUBJECT PREMISES"), both located at 595 Lawrence Expressway, Sunnyvale, California, as further described in Attachment A.

2.      For the reasons set forth below, there is probable cause to believe that the SUBJECT PREMISES contain items, as further described in Attachment B, which constitute evidence, fruits, and/or instrumentalities of violations of 18 U.S.C. § 371 (Conspiracy to Commit Visa Fraud); 18 U.S.C. § 1546(a) (Visa Fraud); 18 U.S.C. § 1030(a)(3) (Unauthorized Access to a Government Computer); 18 U.S.C. § 1001(a)(3) (Use of False Documents); 18 U.S.C. § 1028A (Aggravated Identity Theft); and 18 U.S.C. § 2 (Aiding and Abetting).

3.      The statements contained in this affidavit are based upon my personal knowledge and/or on information provided by other law enforcement officers, agents, and personnel, as well as on my experience, background, and training. Because this affidavit is submitted for the limited purpose listed above, I have not included each and every fact known to me concerning this investigation. I have set forth only those facts that I believe are necessary to establish probable cause. Where I have reported statements made by others or from documents that I have reviewed, those statements are reported in substance and in part, unless otherwise noted.

### II. AGENT BACKGROUND

4.      I have been a Special Agent with the Department of Homeland Security (DHS), Immigration and Customs Enforcement (ICE), Homeland Security Investigations (HSI), or its predecessor agency, the United States Customs Service, since November 2002. Since April 2009, I have been assigned to the Document and Benefit Fraud Task Force for the San Francisco, California, Office of the Special Agent in Charge. My previous assignments include the Joint Terrorism Task Force (2007-09), the Compliance Enforcement Unit (2006-07), the Benefit Fraud Unit (2004-06), and the Contraband Smuggling Group (2002-04).

5.      Since 2004, I have participated in at least 50 visa fraud investigations, three of which involved educational institutions, and have interviewed hundreds of aliens suspected of violating the U.S. immigration laws. I have been involved in over 25 search warrants, at least ten of which alleged visa fraud violations, and over 50 arrests for student visa violations.

6.      In addition to completing the Criminal Investigator Training Program and the Customs Basic Enforcement School at the Federal Law Enforcement Training Center (2003), I have received extensive training in enforcing U.S. immigration laws and investigating immigration benefit fraud schemes. I have participated in the Customs-Immigration Cross Training Program (2004), ICE's National Security Investigations Western Region Training

Conference (2008), and ICE's Document Fraud and Terrorism course (2010). From these trainings I learned about common indicators of visa fraud and student visa status violations.

7.     I have also discussed this investigation with an ICE adjudicator assigned to the Student Exchange and Visitor Program (SEVP) School Certification Branch, who has been involved in the inspections of at least 27 SEVP-approved schools. From these discussions, I know that all U.S. schools must file a petition and be approved by SEVP before they can sponsor foreign nationals to receive student status to enter and remain in the United States. SEVP approval is contingent upon a petitioning school's agreement to abide by certain regulations that require, among other things, reporting of foreign student residence addresses and failure of foreign students to maintain full courses of study. A school that does not comply with the reporting requirements may have its sponsorship privileges revoked.

8.     As a result of this training and experience, I am familiar with the United States' immigration laws and regulations, including those relating to student visas and status violations. I am aware that an alien who has entered the United States on a valid student visa may become removable if that alien fails to comply with the visa terms. I know that there is a very high demand for student visas, and that some people seek such visas as a means of entry into the United States without ever intending to pursue a full course of study. I also know that some schools seek to profit from the demand for student visas by issuing visa-related documents and falsely reporting students' status to DHS in exchange for "tuition" fees. Such schools are typically not accredited, although they often claim to be in the process of receiving accreditation, have unusually low attrition rates, and lack reasonable facilities to accommodate student instruction. Typically, the student populations of such schools are predominately foreign nationals, heavily weighted toward a few ethnic groups due to the tendency to recruit by word of mouth (with referral payments to current students).

### III. SUMMARY OF STUDENT VISA PROGRAM

9.     The Immigration and Nationality Act identifies several categories of foreign nationals who may be admitted to the United States for non-immigrant purposes. *See* 8 U.S.C. § 1101. One such category, designated "F-1," comprises "bona fide student[s]" coming temporarily to study at an approved school. 8 U.S.C. § 1101(a)(15)(F)(i); 8 C.F.R. § 214.1(a)(2). Those entering the United States on an F-1 student visa are admitted for a temporary period called "duration of status," meaning "the time during which an F-1 student is pursuing a full course of study" at an approved school. 8 C.F.R. § 214.2(f)(5)(i). When a student stops pursuing a full course of study, the duration of status ends and the temporary period for which the individual was admitted expires.

10.     A school seeking approval to admit foreign students must submit a Petition for Approval of School for Attendance by Nonimmigrant Student, also called a Form I-17, to SEVP in Washington, D.C. The I-17 is first submitted electronically, through the Student and Exchange Visitor Information System ("SEVIS"). As part of the I-17 approval process, SEVP conducts a site inspection, during which the inspector collects an original, signed I-17 and supporting documents. For an unaccredited school, the supporting documents generally include

evidence establishing that its courses have been and are unconditionally accepted by at least three accredited institutions of higher learning.

11. The petitioning school must also provide SEVP with a Record of Designated School Officials ("DSOs"), called a Form I-17A, which the DSOs must sign to certify their knowledge of and intent to comply with student immigration laws and regulations. Once a school is approved, its DSOs are issued login IDs and passwords enabling them to access SEVIS. SEVIS is a nonpublic computer system located in Rockville, Maryland, which is used by the United States government and operated through SEVP for the purpose of collecting nonimmigrant student information from approved schools and monitoring such aliens' status. SEVIS is accessible only by DSOs and government personnel.

12. To enter the United States on a student visa, a foreign national must present a Certificate of Eligibility for Nonimmigrant ("F-1") Student Status, also known as a Form I-20, which is printed from SEVIS. An "initial I-20" certifies that the student has been accepted for enrollment in a full course of study, and is signed by a DSO. The school activates the student's SEVIS record and prints an "active I-20" after the student arrives and begins making normal progress toward a full course of study, which requires physical attendance. The school's DSOs are required to report in SEVIS within 21 days the failure of any student to maintain active status.

13. SEVP-certified schools are required to keep certain records and information relating to each foreign student to whom it has issued a Form I-20, and such records and information must be provided to SEVIS upon request. *See* 8 C.F.R. § 214.3(g)(1). Among other things, the schools must retain the student names, dates of birth, applications, dates of commencement and termination of studies, and I-20s. An experienced SEVP adjudicator, who has conducted over forty Site Visits, has advised me that every school at which she has conducted a Site Visit maintained these student records on the school's campus.

14. It is a criminal offense to "knowingly forge[] . . . or falsely make[] any . . . document prescribed by statute or regulation for entry into or as evidence of authorized stay . . . in the United States," or to "use[], attempt[] to use, posses[], obtain[], accept[], or receive[]" any such document, "knowing it to be forged . . . or falsely made, or to have been procured by means of any false claim or statement, or to have been otherwise procured by fraud or unlawfully obtained." 18 U.S.C. § 1546(a).

## IV. SUMMARY OF PROBABLE CAUSE

### A. Background

15. HGU is located in Sunnyvale, California and purports to offer Master's degrees in Computer Science, Electronics Engineering, and Business Administration. According to HGU's website, Jerry WANG ("WANG") is the CEO; Ying Qiu Wang ("Ying") is the President; and Su Tong ("Tong") is the CFO. Immigration records show that Ying is WANG's father and Tong is WANG's mother; the family immigrated to the United States from China in 1993-94. WANG,

age 34, and Ying, age 63, are naturalized U.S. Citizens. Tong, age 63, is a Lawful Permanent Resident.

16. Ying is also the founder and President of UEWM, located on the same campus as HGU, at 595 Lawrence Expressway. According to UEWM's website, WANG is the CEO.

17. On July 24, 2012, a grand jury in the Northern District of California returned a fifteen-count Indictment against WANG. The Indictment (CR 12-581 EJD) charges WANG with conspiracy to commit visa fraud, in violation of 18 U.S.C. § 371; visa fraud, in violation of 18 U.S.C. § 1546(a); unauthorized access to a government computer, in violation of 18 U.S.C. § 1030(a)(3); use of false documents, in violation of 18 U.S.C. § 1001(a)(3); aggravated identity theft, in violation of 18 U.S.C. § 1028A; and aiding and abetting, in violation of 18 U.S.C. § 2. This Indictment is filed under seal pending WANG's arrest. ICE is planning to arrest WANG at the time this search warrant is executed.

### B. HGU's I-17 and False Attachments

18. I know from my review of SEVIS records that a Form I-17 for HGU was submitted electronically on July 6, 2007. The I-17 identified the date of HGU's establishment as December 12, 2005, and Ying as its owner. Form I-17A, Supplement A identifies WANG as the Primary (and sole) DSO. At the time the petition was submitted, HGU and UEWM were located at 970 W. El Camino Real in Sunnyvale, CA.

19. SEVIS records show that HGU's site visit occurred on July 30, 2007, at the 970 W. El Camino Real location. The site visit inspector noted that "UEWM apparently control the records for Herguan University because the school (Herguan) does not have a separate registrar's office" and "according to the PDSO that non-immigrant student records will be kept in a lock file cabinet located in the Registrar's office of UEWM upon approval of SEVIS" [sic].

20. During the site visit, the SEVP inspector interviewed WANG as the "owner" and Primary DSO, and collected from him HGU's original, signed I-17 and I-17A, as well as three transfer letters. The I-17 is signed by Ying as President, dated July 10, 2007. The I-17A is signed by WANG and Ying.

21. The first agreement, dated July 9, 2007, purports to be from Andres Bella of the Academy of Chinese Culture & Health Services (ACCHS). The letter represents that Bella supports HGU's I-17 petition, and that HGU student "Li Ling" had transferred credits to ACCHS. I have interviewed Bella, however, and he denies having written such a letter in support of HGU. Rather, Bella advised, he wrote the letter in support of UEWM. Bella said that he would never provide such a letter for HGU because it was not accredited. Moreover, Bella said he did not know a "Li Ling" and was not aware of her transferring to ACCHS. I also interviewed a Ling Li who advised that she worked as the admissions director for UEWM, where WANG was her supervisor. Li denied having ever taken classes at UEWM, HGU, or ACCHS, or attempting to transfer any credits to any of these schools.

22. The second transfer letter provided to the inspector was from Chengguang Shi of UEWM, dated July 8, 2007. The letter advises that Su Tong – WANG's mother – was a transfer

4

student from HGU. When interviewed, Shi admitted that WANG, Ying, and Tong are his supervisors at UEWM. Shi said he could not verify anything in the letter as true. He did not recall signing the letter, or recall Tong transferring credits to HGU, however he advised that he signed many UEWM documents without reading them. I have not yet interviewed Tong due to the family relationship. The third transfer letter, from Yo San University of Traditional Chinese Medicine in Los Angeles, contained non-committal language, rather than the language required by regulation, and the author, Lawrence Lau, confirmed his signature. (Neither the second nor the third transfer letter is charged in the Indictment.)

### C. HGU's False Supplemental Submissions

23.     SEVIS records show that, on August 8, 2007, SEVP issued a request for evidence, stating that it needed letters from three different schools "attesting they have accepted, and continue to accept unconditionally, credits from your school" or, alternatively, three employment letters, "written and signed by the employer(s) attesting graduates of your school are fully qualified in their field of study, as a result of the training they gained at your institution." The request for evidence further instructed: "Additionally your school should provide evidence supporting the students referenced in the letters, or college acceptance letters, program enrollment and completion/transfer dates (e.g. transcript copies)." It is not clear why SEVP requested three more articulation agreements; SEVP personnel are not able to say definitively based on the records. There is a note in the SEVP file stating that the "letters" were incomplete, followed by a notation that a Request for Evidence had been issued.

24.     In response to SEVP's request, WANG sent SEVP a signed cover letter with employment letters and transcripts for purported HGU graduates Candace Zheng, Shane Guan, and David Wang (no known relation to WANG). WANG's cover letter is undated, but it bears a "Received by SEVP" stamp with the date August 16, 2007. The transcripts contain the student's names, dates of birth, and social security numbers; are on HGU letterhead; and are dated August 8, 2007. Each transcript lists identical courses and the same sequence of courses taken for each purported student.

25.     The first employment letter, from Alex Shi of UEWM, states that Zheng works for UEWM as an "herbal consultant/manager assistant" and that she graduated from HGU in April 2007. Shi is the same individual who signed the UEWM transfer letter, and who is the employee of WANG, Ying, and Tong. Shi stated that he could not recall what Zheng's position was but knew she worked at UEWM's clinic. Zheng, who had changed her last name to Luo shortly before she was interviewed, stated that she graduated from UEWM in December 2008, worked for UEWM as a receptionist, and never attended HGU. She confirmed the social security number and date of birth on the transcript as her own, but noted that her dates of attendance and graduation were false.

26.     The second employment letter, from JingGang Tang of Vital Core Biosystems Inc., states that Shane Guan graduated from HGU on April 15, 2007 and is employed by Vital Core as a Marketing Officer. When interviewed, Guan stated that he had never heard of Vital Core and never worked for them. He advised that he was a student at UEWM and had not yet graduated. He knew that HGU was co-located with UEWM. After being shown a copy of the

5

HGU transcript, Guan stated that he did not want to say anything derogatory about UEWM or HGU because his mother is friends with the schools' owners. He confirmed his social security number and date of birth, and suggested that perhaps he had taken HGU courses and graduated without realizing it. Tang explained that Vital Core is the supply department of UEWM and that WANG is his direct supervisor. Shown the employment letter, Tang stated that WANG had typed it and asked him to sign, explaining that it was a reference letter that would be used to help Guan get a job. Tang stated that he did not know Guan but felt pressured by WANG to sign the letter.

27. The third letter, from "Lin Lee" of International Institutes for Health and Healing (IIHH), states that David Wang is an Herbal Researcher who graduated from HGU on April 15, 2007. When interviewing Li in connection with the articulation agreement, agents showed Li the IIHH employment letter. Li recognized the phone number in the IIHH letterhead as her old personal cell phone number, but denied having seen the employment letter before, having ever worked for IIHH, or knowing a David Wang. She thought the signature closely resembled hers, however, and brought a sample signature to show the interviewing agents. Having worked for Jerry WANG as the UEWM's admissions director in 2007, Li admitted that she signed many documents in this capacity without reading them. Phone records confirm that the phone number on the employment letter belonged to Li at the time in question. I have not yet located or interviewed David Wang.

### D. Unauthorized SEVIS Access and Creation of Forged I-20s

28. I have interviewed a Yehpin (Carrie) Yang. She advised me that she was hired in May 2009 to be an administrative assistant for HGU, but shortly after she began, WANG asked her to work as the school registrar. According to Yang, quickly after her hiring, WANG gave her his SEVIS user name and password for her to access the SEVIS database and create I-20s for HGU F-1 students. Emails between Yang and WANG confirm that Yang was accessing WANG's SEVIS account; indeed, she changed his password with his consent.

29. Yang told me that, after she created I-20 records, she would print them out for signature. Because she created the forms using WANG's account, the forms automatically printed with WANG's signature block. At WANG's request, when he was not available, Yang had Tong or Ying sign the forms. Yang reported that Tong and Ying tried to imitate WANG's signature. If they accidentally signed in their own names, they would tear up the I-20 and sign a new one in WANG's name. When all three were to be traveling, WANG instructed Yang to sign I-20s herself; she refused. Yang quit working for HGU in August 2010.

30. I have also interviewed a Ling Zhang, who worked as a registrar for HGU between October 2008 and September 2009. Similar to Yang, Zhang told me that WANG gave her his SEVIS username and password shortly after she began working for him, and instructed her to enter data in SEVIS and print I-20s. Zhang advised that WANG also told her to take the I-20s to Tong and Ying for signature if he was not available, and that she observed Tong and Ying forge WANG's signature. Zhang further stated that, once WANG delegated his SEVIS responsibilities, he came to the office much less frequently -- sometimes only five minutes in a day to sign I-20s, and on some days not at all.

31.     Zhang stated that at one point, WANG told her that it was illegal for her to access SEVIS, and because of this, she should become a DSO and obtain her own SEVIS account. Zhang advised that she was not comfortable signing up with the government to become a DSO, due to the forged signatures and her observations that HGU admitted all applicants upon payment of fees, regardless of qualifications or missing documentation.

32.     U.S. Customs and Border Patrol (CBP) records show that WANG took several international trips in 2009 and 2010. SEVIS records show that approximately 125 Form I-20s were created during periods when CBP records show that WANG was out of the United States. For example, CBP records show that WANG left the United States for China on September 11, 2010 and returned on October 6, 2010. ICE agents have acquired four I-20s created during this time frame, and have interviewed the students who received them. All four were created between September 20 and 23, 2010, with a signature purporting to be WANG's.

### E.  SEVP/ICE Compliance Visit

33.     On November 17, 2010, I participated in a SEVP Compliance Site Visit of HGU. By this time HGU had moved to the current location at 595 Lawrence Expressway, Sunnyvale, CA.  The SEVP personnel identified themselves as such, but my fellow ICE agent and I did not identify ourselves as federal agents at first. During the visit, we interviewed WANG.  SEVP's standard Compliance Site Visit form asks what action the school takes to ensure students' progression with their courses of study and failure to maintain such progress.  WANG advised that attendance is monitored by students signing attendance sheets; that students receive an "F" grade for failure to attend classes, followed by academic probation and termination; and that foreign students failing to meet full course of study requirements are issued academic warning letters and then terminated in SEVIS.  WANG further advised that student records were currently stored in a locked fireproof cabinet in the registrar's office.

34.     After the interview, SEVP personnel requested a campus tour.  WANG agreed and pointed out several lightly attended classes in session, which he said were HGU classes. After the personnel asked to sit in and meet the instructors, WANG admitted that these were UEWM classes and that all HGU classes had been cancelled for the evening.  My fellow agent and I then identified ourselves as such and advised WANG we knew there was no physical attendance by foreign HGU students – a violation of SEVP regulations.  WANG then stated that HGU used to require physical attendance, but students had transferred to other schools.  WANG explained that HGU had recently begun major campus renovations and was temporarily allowing all of its foreign students to attend entirely online.  They planned, however, to resume physical classes in the near future.  At the conclusion of the site visit, SEVP personnel gave WANG a Request for Evidence, asking for attendance records, academic warning letters, and articulation agreements with accredited schools (agreements representing that the school unconditionally accepts credits from HGU), among other things.

35.     On December 16, 2010, WANG sent SEVP a signed and notarized letter responding to its Request for Evidence.  WANG stated in the letter: "During the renovations, [HGU] allowed students to enroll in simultaneous broadcasting classes for the Fall 2010

7

semester, which caused significant educational challenges and SEVIS compliance issues during this semester." In fact, various documents – including numerous emails from students and a November 30, 2010 email to WANG from HGU's Admissions Officer – make clear that many students had been taking all online classes since Fall 2009.

36. Along with the letter, WANG submitted the various documents requested by SEVP, including sample HGU attendance and academic warning letters. A review of emails provided by one of HGU's officers who has been cooperating with ICE investigators reveals that the warning letters were newly fabricated. All typographical errors are in the originals.

37. On December 1, 2010, WANG emailed HGU's Vice President of Organizational Development, Richard Friberg: "Institution's attendance and academic warning letters do we have them? I know we have institution's attendance policy is in the catalog. But we never have academic warning letters. Can you create one?"

38. Friberg responded on December 2, 2010: "Jerry, I am not sure what this is for. Are there SEVIS rules that must be complied with? . . . . They are asking for these letters for a reason. Don't step in a trap." Friberg embedded into his email two sample letters. They are virtually identical to the Attendance Warning Letter and Academic Warning Letter that WANG submitted to SEVP two weeks later.

39. On December 3, 2010, WANG explained to Friberg the purpose of his request: "SEVP was asking me if student did not meet the full academic standing what does the school do. I said if student do not follow meet the full academic standing we will find out from our system and dismiss the student. SEVP said they want to see the academic warning letters to students."

40. Regarding the request for articulation agreements, WANG stated in his letter: "We submitted other articulation agreements to SEVP in 2008 and we are unable to locate additional copies to respond to this Request for Evidence. Now that we are a thriving institution and receive incoming transfer students from our competitor institutions, the same institutions are not willing to enter into articulation agreements with HGU or even to confirm in writing that they accept our credits when students transfer."

41. In June of 2012, I interviewed Mikhail Brodsky, the president of the Lincoln University in Oakland, California. Brodsky stated that in late 2010 or early 2011, an Asian family consisting of a husband, wife, and son, approached him at his Lincoln University office. According to Brodsky, the family told him that they were owners of HGU and attempted to bribe him for an articulation agreement, which he declined.

## F. Commingling of UEWM and HGU Foreign Students

42. In the course of my investigation, I have come upon evidence that UEWM was unilaterally enrolling students at HGU, without their knowledge. SEVIS shows that UEWM was approved to enroll foreign students in traditional Chinese medicine programs on August 6, 2003. In April 2007, SEVIS records reveal, UEWM began enrolling hundreds of F-1 students from

8

India; more than 390 such students were enrolled between April 2007 and HGU's I-17 approval on February 14, 2008. Although UEWM was authorized to enroll foreign students only in traditional Chinese medicine programs, it began enrolling many of these Indian students in business and science programs. In September 2008, SEVP moved to withdraw UEWM's approval to enroll foreign students, based in part on its enrolling foreign students in unauthorized programs. In October 2008, HGU obtained SEVP approval to enroll foreign students in an expanded degree program, including science, technology, engineering, and mathematics fields. UEWM immediately began transferring its Indian graduate students in such programs to HGU, leaving UEWM with no Indian students.

43.     Based on my training and experience, I know that there is a high demand among foreign students, particularly foreign students from India, for United States graduate degrees in the fields of science, technology, engineering, and mathematics. SEVIS shows that the vast majority of foreign students enrolled at HGU are from India and are enrolled in such graduate programs. This demand comes largely from the fact that foreign students in such fields are eligible not only for immediate work authorization, but also for continued post-graduation work authorization for extended periods, under 8 C.F.R. § 214.2(f)(10)(i) and (ii)(C). There is much less demand among these foreign students for programs in traditional Chinese medicine.

44.     In my interview of HGU employee Ling Zhang, Zhang advised that one of her duties was to clean up UEWM and HGU student files, which were a mess due to the crossover between UEWM and HGU students. Zhang stated that many Indian students who were issued UEWM I-20s were secretly transferred to HGU without their knowledge or consent. According to Zhang, many of these students wanted to stay at UEWM because it was accredited, and demanded to be transferred back to UEWM. HGU officials refused to issue transcripts to these students until they agreed to stop demanding to be transferred back to UEWM.

45.     I have also learned from my investigation that HGU may have enrolled numerous foreign students before obtaining SEVP approval to do so. For example, SEVP received a letter postmarked November 8, 2007, stating:

> I, a current student at Herguan University, have been admitted to study for my Masters in Computer Engineering. After receiving I-20 it was stated from University of East-West Medicine as a medicine degree. I am worried about my visa status because I don't see Herguan University listed in your list to give out I-20. Also I see that University of East-West Medicine is listed. Are they allowed to give I-20 for another university? They keep saying everything is ok, but we don't know...I will keep myself anonymous due t any problems that I may receive regarding visa status...

Any I-20s issued by HGU prior to SEVP's approval for it to admit foreign students would be fraudulently created.

9

### G. Financial Investigation

46.    My investigation has revealed that virtually all tuition revenue generated at HGU comes from foreign students. In WANG's signed and notarized letter to SEVP, dated December 16, 2010, WANG stated "pending accreditation, HGU attracts only international students . . . there is no good reason for a U.S. student to attend an institution of higher education in the United States until it become an accredited institution." The letter further stated that HGU charges "approximately $2,655 per semester." While HGU's Form I-17 and website confirm that the school has three terms per year, F-1 students are required to register for only two terms each year. SEVIS records show 626 F-1 students in active status at HGU. Thus, the expected tuition revenue for F-1 students is at least $3,324,060 per year.

47.    I have reviewed records for Bank of America business checking account -1228, held in the name "Herguan University, Inc." These records show that the account had $10,426,756.54 in deposits and $10,236,907.41 in withdrawals between February of 2008 and September of 2011.

## V. ELECTRONIC EVIDENCE

### A. Background Information

48.    I have consulted with experienced agents who have had training in the investigation of computer-related crimes. Based on my own training and experience, as well as the training and experience of other agents with whom I have consulted, I know the following:

49.    Computer hardware, software, documentation, passwords, and data security devices may be important to a criminal investigation in two distinct respects: (1) the items themselves may be instrumentalities, fruits, and/or evidence of crime; and/or (2) items may have been used to collect and store information about crimes (in the form of electronic data).

50.    Individuals who use computers or the Internet in furtherance of criminal activity often store, intentionally or unintentionally, evidence of the criminal activity on their computers and on digital storage media for an indefinite period of time. Computers often store data relating to a computer user's activity automatically and without the computer user's knowledge. It is often possible for a trained forensic examiner to recover evidence from computers and digital storage media even after an attempt has been made by the computer user to delete the evidence.

51.    Electronic evidence can be stored and found on many forms of digital storage media. Traditional forms of digital storage media include, but are not limited to, floppy disk drives, hard disk drives, tape drives, "thumb" drives, CDs, or DVDs. In addition, there are now commonplace consumer electronic devices that can be connected to computers and used as digital storage media, including portable hard drives, mobile phones, handheld games or gaming consoles, organizers or personal digital assistants (PDAs), and cameras or video cameras, as well as memory cards that can be used in both computers and consumer electronic devices. Individuals engaging in criminal activity often attempt to hide information relating to the criminal activity by storing it in unusual or unexpected places. Therefore, as used herein, the

10

term "digital storage media" includes traditional forms of digital storage media, as well as any other electronic device or storage medium which is capable of storing information in digital form and being connected to a computer.

52.    During the execution of a search warrant involving computers and other electronic evidence, it is often necessary to seize hardware, software, and documentation for subsequent examination. In particular, a proper forensic examination of computers or digital storage media can often be conducted only in the controlled setting of a computer forensic lab, both to ensure, and to be able to prove, that the evidence has not been modified or deleted from the time of seizure. This is true for a number of reasons, including the following:

a.    Computer storage devices can store the equivalent of thousands of pages of information. Additionally, a suspect may try to conceal evidence; he or she might also store it in random order with deceptive file names. This may require searching authorities to examine all the stored data to determine which particular files are evidence or instrumentalities of crime. This sorting process can take weeks or months, depending on the volume of data stored, and often it would be impractical to attempt this kind of search on site.

b.    Searching computer systems for criminal evidence is a highly technical process requiring expert skill and a properly controlled environment. For example, on site and laboratory analysis by a qualified computer specialist is often required in order to properly retrieve and analyze electronically-stored (computer) data, document and authenticate the data, and prevent the loss of the data either from accidental or deliberate programmed destruction.

c.    Computer users can attempt to conceal data within computer equipment and storage devices through a number of methods, including the use of innocuous or misleading filenames and extensions. For example, files with the extension ".jpg" often are image files; however, a user can easily change the extension to ".txt" to conceal the image and make it appear that the file contains text. Computer users can also attempt to conceal data by using encryption, which means that a password or device is necessary to decrypt the data into readable form. In addition, computer users can conceal data within another seemingly unrelated and innocuous file, for example to conceal text in an image file which cannot be viewed when the image file is opened. Therefore, a substantial amount of time is necessary to extract and sort through data that is concealed or encrypted to determine whether it is evidence, contraband, or instrumentalities of a crime.

d.    In many cases, the evidentiary data can be backed up to government-owned computer data storage devices at the site of the search. However, there are circumstances that may necessitate the seizure and removal of the entire computer system and peripheral devices to a secure laboratory setting in order to analyze and extract the evidence. To effect accurate and complete analysis may require seizure of all computer equipment and peripherals which may be interdependent, the software to operate the computer system, data security devices (including passwords) and related instruction manuals which contain directions concerning the operation of the computer system and software programs. This is true because the peripheral devices that allow users to enter or retrieve data from the storage devices vary widely in their compatibility with other hardware and software. Many system storage devices require particular

11

input/output devices in order to read the data on the system. It is important that the computer expert be able to properly re-configure the system as it now operates in order to accurately retrieve the evidence. In addition, the computer expert needs the relevant system software (operating systems, interfaces, and hardware drivers) and any applications software which may have been used to create the data (whether stored on hard drives or on external media), as well as all related instruction manuals or other documentation and data security devices.

        e.     Furthermore, seizure of computer hardware, software, and documentation is not only necessary at times, but is often the more practical alternative and less intrusive than requiring federal agents to remain at the search site for the lengthy amount of time that would be required to review, analyze, and copy pertinent data.

    53.    Based on the above facts and circumstances and information, permission is requested to seize all computer systems and peripherals if necessary even though there may be unrelated information stored on the computer system(s). This unrelated data will not be used and will be separated (to the extent possible) from the evidentiary data and preserved. The search will be performed in compliance with the Northern District of California Protocol for Searching Devices or Media that Store Data Electronically, as set forth in Attachment C to this affidavit, and as discussed in greater detail in Paragraphs 52 through 60 below.

### B. Definitions

    54.    The terms "records," "documents," and "materials" include all of the items described in Attachment B in whatever form and by whatever means they may have been created and/or stored. This includes any handmade, photographic, mechanical, electrical, electronic, and/or magnetic forms. It also includes items in the form of computer hardware, software, documentation, passwords, and/or data security devices.

    55.    Computer hardware consists of all equipment which can collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, optical, or similar computer impulses or data. This includes any data-processing devices (such as central processing units, memory typewriters, and self-contained "laptop" or "notebook" computers); internal and peripheral storage devices (such as fixed disks, external hard disks, floppy disk drives and diskettes, tape drives and tapes, optical storage devices, transistor-like binary devices, compact flash cards, smart media cards and other memory storage devices); peripheral input/output devices (such as keyboards, printers, scanners, plotters, video display monitors, and optical readers); related communications devices (such as modems, cables and connections, recording equipment, RAM or ROM units, acoustic couplers, automatic dialers, speed dialers, programmable telephone dialing or signaling devices, and electronic tone-generating devices); as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware (such as physical keys and locks).

    56.    Computer software is digital information which can be interpreted by a computer and any of its related components to direct the way it works. Software is stored in electronic, magnetic, optical, or other digital form. It commonly includes programs to run operating

systems, applications (like word-processing, graphics, or spreadsheet programs, utilities, compilers, interpreters, and communications programs).

57. Computer-related documentation consists of written, recorded, printed, or electronically stored material which explains or illustrates how to configure or use computer hardware, software, or other related items.

58. Computer passwords and other data security devices are designed to restrict access to or hide computer software, documentation, or data. Data security devices may consist of hardware, software, or other programming code. A password (a string of alpha-numeric characters) usually operates as a sort of digital key to "unlock" particular data security devices. Data security hardware may include encryption devices, chips, and circuit boards. Data security software or digital code may include programming code that creates "test" keys or "hot" keys, which perform certain pre-set security functions when touched. Data security software or code may also encrypt, compress, hide, or "booby-trap" protected data to make it inaccessible or unusable, as well as reverse the process to restore it.

59. System peripherals are pieces of equipment that send data to, or receive data from, a computer. Keyboards, mouses, printers, scanners, plotters, video display monitors, and certain types of facsimile machines are examples of peripherals.

60. Storage media comprises any material capable of storing information in a manner that can be used by computer hardware to save and/or retrieve information. Examples of storage media include diskettes, CD-ROMs, DVDs, magnetic tapes, ZIP disks, JAZ disks, and EPROMS.

C. **Electronic Search and Seizure Procedures**

61. In executing the warrant, law enforcement agents will comply with the Northern District of California Protocol for Searching Devices or Media that Store Data Electronically, as set forth in Attachment C to this affidavit. Law-enforcement officers will begin by ascertaining whether all or part of a search of a device or media that stores data electronically ("the device") reasonably can be completed at the location listed in the warrant ("the site") within a reasonable time. If the search reasonably can be completed on site, the officers will remove the device from the site only if removal is necessary to preserve evidence, or if the item is contraband, a forfeitable instrumentality of the crime, or the fruit of a crime.

62. If the law enforcement officers determine that a search reasonably cannot be completed on site within a reasonable time period, they must determine whether all or part of the authorized search can be completed by making a mirror image of, or in some other manner duplicating, the contents of the device and then conducting the forensic review of the mirror image or duplication off site. The law enforcement officers will complete a forensic review of that mirror image within 120 days of the execution of the search warrant.

63. In a circumstance where the law enforcement officers determine that a mirror image of the contents of a device cannot be created on site in a reasonable time, the government

cause to believe, that evidence, fruits, and/or instrumentalities of these violations, including those items listed in Attachment B, will be found at the SUBJECT PREMISES.

I declare under penalty of perjury under the laws of the United States the foregoing is true and correct.

Jason G. Mackey, Special Agent
U.S. Department of Homeland Security
Immigration and Customs Enforcement

Sworn and subscribed to before me this __31__ day of July, 2012.

HON.  PAUL S. GREWAL
United States Magistrate Judge

## ATTACHMENT A

ADMINISTRATIVE OFFICES OF HERGUAN UNIVERSITY AND THE UNIVERSITY OF EAST-WEST MEDICINE LOCATED AT 595 LAWRENCE EXPRESSWAY, SUNNYVALE, CALIFORNIA



595 Lawrence Expressway is a two-story commercial structure located at the intersection of Lawrence Expressway and Oakmead Parkway in Sunnyvale, CA. Located inside are classrooms and the offices of Herguan University and University of East West Medicine. The offices include a registrar office, finance office, and offices of Jerry WANG, Ying WANG, and Su TONG. The numbers "595" appear on the Northeast top corners of the building. A large sign reading "Herguan University" is located above the front entrance of the building on the top east side. A sign reading "University of East West Medicine" is located on the top north side of the building, and a sign reading "Medical Center University of E W Medicine" is located on the top west side of the building. The front entrance is located under the "Herguan University" sign. A rear door is located below the "Medical Center University of E W Medicine" sign. Numerous side doors are located on both the north and south sides.

## ATTACHMENT B

### ITEMS TO BE SEIZED

All items and records which constitute evidence, fruits, or instrumentalities of violations of 18 U.S.C. § 371 (Conspiracy to Commit Visa Fraud); 18 U.S.C. § 1546(a) (Visa Fraud); 18 U.S.C. § 1030(a)(3) (Unauthorized Access to a Government Computer); 18 U.S.C. § 1001(a)(3) (Use of False Documents); 18 U.S.C. § 1028A (Aggravated Identity Theft); and 18 U.S.C. § 2 (Aiding and Abetting) as identified below.

As used in this Attachment, the term "records" includes all of the items described in whatever form and by whatever means they may have been created and/or stored. This includes any handmade, photographic, mechanical, electrical, electronic, paper, digital, and/or magnetic forms. It also includes items in the form of computer hardware, software, documentation, passwords, e-mail, and/or data security devices.

The items and records to be seized from the SUBJECT PREMISES (described in Attachment A) include:

1. Records related the acquisition and maintenance of foreign student ("F-1") status for current and former foreign HERGUAN UNIVERSITY (HGU) and UNIVERSITY OF EAST-WEST MEDICINE (UEWM) students and applicants for the period between July 6, 2007, and the present, including visa applications, Forms I-20, Student an Exchange Visitor Information System (SEVIS) manuals and printouts, admissions applications and supporting documents, letters of acceptance/denial, supporting financial records, records of tuition and fee payments, attendance records, transcripts, diplomas, and records of any courses currently and previously held;

2. Records related to HGU and UEWM's authorization to admit foreign nationals, including Forms I-17 and I-17A, and all supplemental documentation in support of those applications, including transfer letters, articulation agreements, employment letters, employment and academic records related to individuals named in such documents, payments related to the acquisition of transfer letters or articulation agreements, and correspondence related to the acquisition and filing of such documents;

3. Applications, attendance sheets, and transcripts for Candace Zheng, Shane Guan, and David Wang.

4. Travel records related to Jerry WANG, Su Tong, and Ying Wang for the period between February 14, 2008, and the present, including passports, visas, airline tickets, boarding passes, and airline ticket receipts;

5. Address books, telephone lists and directories, and telephone records for Jerry WANG, Su Tong, and Ying Wang, between July 6, 2007, and the present;

6. Financial records related to HGU, UEWM, Vital Core Biosystems, Inc.; International Institutes for Health and Healing; Jerry WANG, Su Tong, and Ying Wang, for the period between July 6, 2007, and the present, including but not limited to tax records, investment account records, bank account records, account applications, account statements, signature cards, withdrawal slips, debit and credit memos, checkbooks, deposit slips, canceled checks, client checks, cashier's checks, financial statements, wire transfer records, wiring instructions, loan records, and credit reports;

7. Title, deed, escrow, lease, or other records for property purchased or leased by Jerry WANG, Su Tong, Ying Wang, HGU, or UEWM, for the period between February 14, 2008, and the present;

8. Money orders, personal checks, cashier's checks, credit card receipts, and other receipts relating to or constituting proceeds from the production or filing of fraudulent visa applications or visa-related forms, or relating to or constituting payments from foreign nationals for the maintenance of immigration status, for the period between February 14, 2008, and the present;

9. Items, documents, and effects showing residency and/or dominion and control of the place to be searched, including but not limited to keys, receipts, bills, canceled checks, mail envelopes, rental agreements, telephone records and bills, utility bills, and internet/cable provider statements for the period between July 6, 2007, and the present;

10. Computer equipment and/or storage devices used to create or store the items, data, or records referenced in the paragraphs of this Attachment, pursuant to the protocol set forth in Attachment C; and

11. Passwords, password files, test keys, encryption codes, operating manuals, and other information necessary to access the computer equipment, storage devices or data, as limited by Attachment C.

United States District Court for the Northern District of California

### *PROTOCOL FOR SEARCHING DEVICES OR MEDIA*
### *THAT STORE DATA ELECTRONICALLY*

THIS PROTOCOL WILL BE ATTACHED TO EACH SEARCH WARRANT
THAT AUTHORIZES A SEARCH OF ANY DEVICE OR MEDIA THAT
STORES DATA ELECTRONICALLY

It Also Will Be Incorporated, At Least As An Attachment,
in the Affidavit Supporting the Warrant

1. In executing this warrant, the government will begin by ascertaining whether all or part of a search of a device or media that stores data electronically ("the device") reasonably can be completed at the location listed in the warrant ("the site") within a reasonable time. If the search reasonably can be completed on site, the government will remove the device from the site only if removal is necessary to preserve evidence, or if the item is contraband, a forfeitable instrumentality of the crime, or the fruit of a crime.

2. If the government determines that a search reasonably cannot be completed on site within a reasonable time period, the government must determine whether all or part of the authorized search can be completed by making a mirror image of, or in some other manner duplicating, the contents of the device and then conducting the forensic review of the mirror image or duplication off site. The government will complete a forensic review of that mirror image within 120 days of the execution of the search warrant.

3. In a circumstance where the government determines that a mirror image of the contents of a device cannot be created on site in a reasonable time, the government may seize and retain that device for 60 days in order to make a mirror image of the contents of the device.

4. When the government removes a device from the searched premises it may also remove any equipment or documents ("related equipment or documents") that reasonably appear to be necessary to create a mirror image of the contents of the device or conduct an off-site forensic review of a device.

5. When the government removes a device or related equipment or documents from the site in order to create a mirror image of the device's contents or to conduct an off-site forensic review of the device, the government must file a return with a magistrate judge that identifies with particularity the removed device or related equipment or documents within 14 calendar days of the execution of the search warrant.

6. Within a reasonable period of time, but not to exceed 60 calendar days after completing the forensic review of the device or image, the government must use reasonable efforts to return, delete, or destroy any data outside the scope of the warrant unless the government is otherwise permitted by law to retain such data.

7. The time periods set forth in this protocol may be extended by court order for good cause.

8. In the forensic review of any device or image under this warrant the government must make reasonable efforts to use methods and procedures that will locate and expose those categories of files, documents, or other electronically-stored information that are identified with particularity in the warrant, while minimizing exposure or examination of irrelevant, privileged, or confidential files to the extent reasonably practicable.

9. For the purposes of this search protocol, the phrase "to preserve evidence" is meant to encompass reasonable measures to ensure the integrity of information responsive to the warrant and the methods used to locate same.