EDWIN PRATHER, CABN 190536
MAX MIZONO, CABN 286573
PRATHER LAW OFFICES
461 Bush Street, Suite 350
San Francisco, CA 94108
Telephone: 415.881.7774
Email: edwin@pratherlawoffices.com
      max@pratherlawoffices.com

Attorneys for Defendant
JERRY WANG

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>        Plaintiff,<br><br>    v.<br><br>JERRY WANG,<br><br>        Defendant. | Case No.: CR 12-00581-EJD<br><br>**DEFENDANT JERRY WANG'S SENTENCING MEMORANDUM**<br><br>Sentencing Date: September 14, 2015<br>Sentencing Time: 1:30 p.m.<br>Sentencing Judge: The Honorable Edward J. Davila |

**TABLE OF CONTENTS**

I.      INTRODUCTION ............................................................................1

II.     PROCEDURAL HISTORY ...........................................................1

III.    FACTUAL BACKGROUND ..........................................................2

    A.   Mr. Wang's Early Life ...........................................................2

    B.   Mr. Wang's Employment History at the University of East-West Medicine...........3

    C.   Mr. Wang's Employment History at Herguan University.......................4

IV.     OBJECTIONS TO THE PRESENTENCE REPORT  ...................................7

V.      SENTENCING GUIDELINES CALCULATION  ....................................8

VI.     SENTENCING RECOMMENDATION ............................................9

    A.   The Nature and Circumstances of the Offense, as well as Mr. Wang's History and
        Characteristics, Support a Three-Month Sentence ……….......................9

        1.   The Nature and Circumstances of the Offense .........................10

            i.    Mr. Wang's Plea Agreement: Count 12 .........................10

            ii.   Mr. Wang's Plea Agreement: Related Conduct .............12

                a.   Access to SEVIS .................................13

                b.   Signing Form I-20s .................................15

        2.   Mr. Wang's History and Characteristics .........................16

            i.    Mr. Wang as Husband and Father.................................17

            ii.   Mr. Wang as Dutiful Son .................................18

            iii.  Mr. Wang's Good Character to All .................................19

            iv.   Philanthropic Efforts and Relationship Building in Asia .............22

            v.    Current Employment.................................24

    B.   A Three Month Sentence Meets the Directives of 18 U.S.C. § 3553(a)(2)...........25

        1.   A Three-Month Sentence Reflects the Seriousness of the Offense ..........25

2.   A Three-Month Sentence Promotes Respect for the Law ........................25

3.   A Three-Month Sentence Provides Just Punishment................................26

4.   A Three-Month Sentence Affords Adequate Deterrence...........................26

5.   A Three-Month Sentence Protects the Public from Further Crimes..........28

C.   A Three-Month Sentence is Appropriate for this Court to Avoid Unwarranted
     Sentencing Disparities ............................................................................28

D.   The $700,000 Forfeiture Amount Further Supports Mr. Wang's Sentencing
     Position ...................................................................................................33

VII.   CONCLUSION ........................................................................................34

## <u>TABLE OF AUTHORITIES</u>

### FEDERAL CASES

*Gall v. United States*, 52 U.S. 39 (2007) ...................................................................33

*United States v. Adelson*, 441 F.Supp. 506 (S.D.N.Y 2006) .......................................26

*United States v. Booker*, 543 U.S. 220 (2005) .............................................................8

*United States v. Stewart*, 590 F.3d 93 (2d. Cir. 2009) ................................................27

### STATUTES

18 U.S.C. § 3553(a) ........................................................................................................9

28 U.S.C. § 994(j) .........................................................................................................25

### OTHER AUTHORITIES

Andrew von Hirsch, et al., *Criminal Deterrence and Sentence Severity: An Analysis of Recent Research (1999*) ..............................................................................................26

# I. INTRODUCTION

Jerry Wang ("Mr. Wang") stands before the Court having pled guilty to one count of Use of False Documents in violation of 18 U.S.C. § 1001(a)(3).  Mr. Wang and the Government entered into a plea under Rule 11(c)(1)(A) and (c)(1)(c) of the Federal Rules of Criminal Procedure, which provides that a reasonable and appropriate disposition is as follows: "no less than three months' imprisonments and no more than two years' imprisonment; $700,000 in forfeiture; waiver of the fine; and $100 special assessment."  (Plea Agreement, ¶ 8.)  In short, Mr. Wang takes full responsibility for his actions and in fact, has already obtained the forfeiture amount of $700,000 and paid it to the government.

As for the remainder of Mr. Wang's sentence, Mr. Wang submits that the very low end of the Plea Agreement's agreed upon range is a sentence sufficient and not greater than necessary to meet the directives under 18 U.S.C. § 3553(a).  Namely, Mr. Wang offers the following in mitigation: the nature and circumstances of his offense; his history and characteristics; the need for this Court to avoid unwarranted sentencing disparities; and the need for restitution.  Such a sentence is an appropriate, fair and just resolution to Mr. Wang's case.

# II. PROCEDURAL HISTORY

On July 24, 2012, the United States Government filed a fifteen-count Indictment against Mr. Wang.  On October 30, 2014, the United States Government filed fourteen-count superseding Indictment.  On April 9, 2015, Mr. Wang plea guilty to 18 U.S.C. § 1003(a)(3), Use of False Documents.  The Court deferred accepting the plea agreement submitted to the Court under Fed. R. Crim. P. 11(c)(1)(A) and (c)(1)(C) until Mr. Wang's sentencing hearing.  The sentencing hearing is currently set for September 14, 2015.

*//*

### III. FACTUAL BACKGROUND

**A.  Mr. Wang's Early Life**

Born on November 26, 1977, in Beijing, China, Mr. Wang spent his childhood in China before he and his mother, Su Tong, immigrated to the United States in 1990, to join his father, Dr. Yinqiu Wang, who had immigrated in the late 1980's.  [PSR ¶ 42-44.]  The family spent their first year living in Oakland, California not without struggle in adapting to their new environment, as the family worked hard to establish their roots and sense of belonging in a foreign city.  As a teenager, Mr. Wang began learning English for the first time through his junior high's "English as a Second Language" program.  *Id.*  Mr. Wang remained in the program throughout high school.

The significant language barrier, however, made life difficult for Mr. Wang.  [PSR ¶ 44.] He spoke little English, and his fellow Chinese students did not speak his Chinese dialect. Absent the ability to converse and confide in his peers, Mr. Wang had troubling making friends and his sense of isolation and loneliness mounted.  [PSR ¶ 44.]  He was often bullied at school and occasionally beaten up for being too "foreign."  *Id.*  Nevertheless, Mr. Wang kept his troubles at school private.  It was only after his mother discovered his physical injuries from the bullying that the family, concerned for Mr. Wang's safety, decided to move away and relocate to Santa Clara, California.  *Id.*

Life improved in Santa Clara.  Mr. Wang adjusted to his new school and began slowly making friends.  He graduated from Homestead high school in 1996, and thereafter attended De Anza Community College.  [PSR ¶ 52.]  After a few years, Mr. Wang transferred to the University of California - Santa Barbara ("UCSB") where he studied Biology and Science,

before majoring in Global Studies with an emphasis on Economics and Politics. *Id.* He received his Bachelor's degree in 2003. *Id.*

### B. Mr. Wang's Employment History at the University of East-West Medicine

Following his graduation from UCSB, Mr. Wang joined the family business, albeit reluctantly. The family business, began as a clinic for his father, Dr. Wang, to practice Chinese medicine (including acupuncture and other Chinese therapies), in Sunnyvale, California. By 1997, the business evolved into the University of East-West Medicine ("East-West"), where Dr. Wang taught Chinese medicine to interested students. In 2005, East-West received accreditation from the Accreditation Commission for Acupuncture and Oriental Medicine for its Master's program in acupuncture and traditional Chinese medicine. To date, over 500 students have since graduated from East-West.

Initially, Mr. Wang worked as an Administrative Officer assisting with admissions and miscellaneous tasks. He later became appointed the Director of Administrative Affairs. When East-West filed its I-17 petition[1] to be approved by Immigration and Custom's Enforcement Student Exchange and Visitor Program ("SEVP")[2] to admit foreign students, Mr. Wang became its Principal Designated School Official ("PDSO").[3]

---

[1] All schools in the United States that enroll nonimmigrant students must be certified by the Student and Exchange Visitor Program. Schools petition for certification using the Form I-17, "Petition for Approval of School for Attendance by Nonimmigrant Student," in the Student and Exchange Visitor Information System. Along with the I-17, the school must submit attachments, including the Form I-17A, Supplement A – a Record of Designated School Officials (DSOs), who certify their knowledge of and intent to comply with student immigration laws and regulations. *See* PSR ¶ 6.

[2] The Student and Exchange Visitor Program is a program within the U.S. Immigration and Customs Enforcement which monitors students and exchange visitors in the United States with F, M, or J visas status. *See* PSR ¶ 6.

[3] All SEVP certified schools are required to have employees dedicated to the international students enrolled there. Every school is required to have one principal designated school official (PDSO) and can have additional designated school officials (DSOs). DSOs are dedicated resources to F and M students who keep their records updated in SEVIS, and a PDSO is a DSO with added responsibilities. The PDSO is the main point of contact for SEVP, must make updates to DSO information and must file for recertification.

Between 2003 and 2005, Mr. Wang worked full time at East-West.  In 2005, the school expanded its staff when it gained accreditation.  This growth coincided with Mr. Wang's waning interest in working at the school.  Disillusioned with work as the school administrator, Mr. Wang also experienced common difficulties in working for a family business.  After all, as the only child in his family, it was his obligation to join the staff at East-West in the first place.

Consequently, Mr. Wang began reducing his work schedule to approximately three to four hours a week.  During his reduced work schedule, he searched for other employment options such as investing in massage stations in shopping malls, medical supply companies, and U.S. – China connections.  Until November 2009, Mr. Wang maintained this reduced work schedule with no formal job duties other than being the PDSO at East-West.

### C. Mr. Wang's Employment History at Herguan University

Mr. Wang eventually began working for the family's other business, Herguan University ("Herguan"), a school started by and developed from Dr. Wang's research known as "Herguan Theory" – upon which Dr. Wang eventually wrote a book entitled *Herguan Law of the Universe*. As early as 2003, Dr. Wang envisioned opening an additional school to be co-located with East-West, where students could also learn about Herguan Theory.  Dr. Wang imagined the school would operate jointly with East-West in the same building with the same classes and faculty.

As a result, in 2005, Dr. Wang took the first steps to incorporate the school as Herguan University ("Herguan").  At the same time, he discussed the Herguan with East-West students and advised them that they could obtain a degree from Herguan in a joint-program with East-West.  The following year, Dr. Wang submitted an application to the educational and

postsecondary school bureau of the California Department of Consumer Affairs[4] that outlined his aspirations for Herguan.

Between Fall 2005 and through 2007, Dr. Wang promoted what he considered to be a joint program between East-West and Herguan for traditional Chinese medicine.  Dr. Wang informed Mr. Wang that approximately ten students at East-West were jointly enrolled at Herguan.  At that time, Mr. Wang had no formal or de-facto role at Herguan, and continued to work only about four hours a week at East-West.

In approximately March 2007, Herguan and East-West hired a new staff member named Ling Li.  Ms. Li had prior admissions experience at other local schools.  At Ms. Li's urging, and relying on her prior work experience at Northwestern Polytechnic University and International Technology University, Herguan and East-West expanded course offerings to include Electrical Engineering, Computer Science, and MBA programs.

Secretly, Ms. Li also operated a student recruiting business that, *inter alia,* recruited students from India.  Ms. Li then recruited students interested in these subjects from India and from her prior school.  Ms. Li also hired faculty to teach courses in these subjects and began admitting students into Herguan for these new programs.  Ms. Li began reaching beyond the scope of her job responsibilities to perform other functions at the two schools including unilaterally hiring new faculty members, setting class schedules, and making staffing decisions.

In July 2007, Herguan submitted an I-17 petition to be approved by SEVP to admit foreign students.  Dr. Wang signed the I-17 petition, and the petition designated Mr. Wang as the

---

[4]     The California Department of Consumer Affairs (DCA) is a department within the California Business, Consumer Services, and Housing Agency. DCA's stated mission is to serve the interests of California's consumers by ensuring a standard of professionalism in key industries and promoting informed consumer practices. The department provides the public with information on safe consumer practices, in an effort to protect the public from unscrupulous or unqualified people who promote deceptive products or services

school's PDSO.  Dr. Wang wanted to designate Mr. Wang as Herguan's PDSO because of his prior experience as PDSO at East-West, and because Mr. Wang possessed greater proficiency with English.  At the time, other than this PDSO designation, Mr. Wang held no other position at Herguan.

In November 2008, Herguan terminated Ms. Li after learning that in 2007, she secretly incorporated a competitor school named California South Bay University and began diverting Herguan students there.  Following Ms. Li's termination, Mr. Wang became the Chief Executive Officer ("CEO") of Herguan in November 2008.

One of Mr. Wang's first actions as CEO was to improve Herguan's compliance with SEVP.  For example, Mr. Wang's letters to SEVP dated May 16, 2011, August 15, 2011, November 28, 2011, and December 1, 2011, describe Herguan's improvements to its practices and procedures to ensure full compliance with SEVP regulations and policies.  *See* Declaration of Max Mizono, Exh. "A".

With Mr. Wang in charge, Herguan became a substantial educational institution.  Since 2010, Herguan received numerous accolades from various community leaders including California Congress and Assembly members, City of San Jose councilmembers, San Mateo county officials, and the former mayor of the City of Sunnyvale.  *See* Declaration of Max Mizono, Exh. "B".

Moreover, Herguan increased its course offerings.  In 2007, Herguan received approval from the California Bureau for Private Postsecondary and Vocational Education ("BPPVE")[5] for

---

[5]     The California Bureau for Private Postsecondary and Vocational Education (BPPVE) was a unit of the California Department of Consumer Affairs whose purpose was to protect students by establishing academic standards for of private institutions of higher education in California. BPPVE approval or exemption was required by the State of California to ensure consumer safety from fraudulent or substandard education providers. The agency ceased operation on July 1, 2007, when the legislative authority for its creation expired.  A new agency, the California Bureau for Private Postsecondary Education, took its place on January 1, 2010.

a Masters of Business Administration program, and in 2011, approval for a Master of Science in Computer Science and Master of Science in Electronics Engineering. Most recently, in December 2015, Herguan received accreditation by the Accrediting Council for Independent Colleges and Schools for Master's Degrees in Business Administration and Management and Computer Science. Herguan continues to offer Masters Degrees in those subjects. *See* Declaration of Max Mizono, Exhs. "C" and "D".

Currently, Herguan has 20 members in its faculty, whose curriculum vitae boast of MBA degrees from, for example, Harvard Business School. Herguan's many graduates are employed at prestigious companies such as PayPal, Chase, Cisco, and Wells Fargo. Herguan has over 500 graduates employed in the United States for the graduating classes from the past three years and enrolls students to this day. *See* Declaration of Max Mizono, Exhs. "C" and "D". Herguan continues on as a substantial educational institution helping hundreds of students achieve professional success in spite of the instant prosecution.

**IV. OBJECTIONS TO THE PRESENTENCE INVESTIGATION REPORT**

Mr. Wang has reviewed the Presentence Investigation Report ("PSR") and maintains his same objections to the PSR:

- [1] Mr. Wang objects to the inclusion of the Witness Tampering language in the Offense Conduct of the PSR and the accompanying 2-level increase for obstruction of justice, pursuant to U.S.S.G. § 3C1.1. Specifically: "First, in the continuation of Paragraph 6 on page 9, the PSR mentions the government's allegations regarding potential witness tampering. Although this discussion is somewhat academic because it does not affect the final sentencing guideline calculation, the defense objects to the discussion of witness

tampering in the PSR.  Mr. Wang has never agreed to facts regarding witness tampering and this is not discussed in the plea agreement."

## V. SENTENCING GUIDELINES CALCULATION

Pursuant to the United States Sentencing Guidelines ("U.S.S.G."), which are advisory after the Supreme Court's decision in *United States v. Booker*, 125 S.Ct. 738 (2005), Mr. Wang has a total offense level of 17.  [PSR ¶ 33.]  Count 12, Use of False Document, is treated as a single group while the stipulated Counts (Count 1 - Conspiracy to Commit Visa Fraud, and Count 5 - Unauthorized Access to a Government Computer) are treated as a second group of closely related counts, as these two counts embody conduct that is treated as a specific offense characteristics in the other.  [U.S.S.G. § 3D1.2(c); PSR ¶ 11.]  The Grouping Rule thus applies for guideline calculation purposes.

For Count Group One, Use of False Document, the base offense level is 6.  [U.S.S.G § 2B1.1(a)(2); PSR ¶ 12.]  The PSR increases the base offense level by two (2) for Obstruction of Justice [U.S.S.G § 3C1.1; PSR ¶ 16], resulting in an adjusted offense level of 8.  It should be noted that defense counsel does not agree with the PSR's calculated increase of two levels for Obstruction of Justice.

For Count Group Two, Visa Fraud/Unauthorized Access to Government Computer, the base offense level is 11.  [U.S.S.G § 2L2.1(a); PSR ¶ 18.]  The base offense level is increased by 9 levels for use of 100 or more documents [U.S.S.G § 2L2.(b)(2)(C); PSR ¶ 19], for a total offense level of 20.  The greater of the adjusted offense levels, as well as the combined offense level, is 20.  [PSR ¶¶ 27, 29.]

Pursuant to U.S.S.G. §§ 3E1.1(a) and (b), Acceptance of Responsibility, Mr. Wang is eligible for a downward adjustment of three (3) levels.  [PSR ¶¶ 31-32.]  The parties calculate

that Mr. Wang has zero criminal history points, and therefore, falls into Criminal History Category I.  [PSR ¶ 428.]  Mr. Wang's adjusted offense level of 17 indexed with a Criminal History Category of I yields a guideline range of 24 to 30 months, confirmed by the PSR.

However, in his Plea Agreement in this case pursuant to Fed. R. Crim. P. 11(c)(1)(A) and (c)(1)(C), Mr. Wang's agreed upon guideline range is no less three-months to no more than twenty-four months.

## VI. SENTENCING RECOMMENDATION

Mr. Wang submits that the low of the guideline range as agreed upon by the parties in the Plea Agreement is sufficient and not greater than necessary to comply with the directives of 18 U.S.C. § 3553(a).  The 3533(a) factors most supportive of Mr. Wang's sentencing position are: the nature and circumstances of his offense; his history and characteristics; the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment for the offense, to afford adequate deterrence, and to protect the public from further crimes; the need for this Court to avoid unwarranted sentence disparities among defendants with similar records to Mr. Wang who have been found guilty of similar conduct; and the need to provide restitution to any victims of the offense.

A careful examination of these factors overwhelmingly supports Mr. Wang's sentencing position.

### A. The Nature and Circumstances of the Offense, as well as Mr. Wang's History and Characteristics, Support a Low Sentence

Under 18 U.S.C. § 3553(a)(1), "the court, in determining the particular sentence to be imposed, shall consider the nature and circumstances of the offense and the history and characteristics of the defendant."  These factors are inextricably intertwined, highly relevant for

sentencing considerations, and explain Mr. Wang's aberrational criminal behavior in an otherwise law-abiding life.

### 1. Nature and Circumstances of the Offense

While Mr. Wang does not contest the validity of his plea agreement, a more detailed explanation of the nature of circumstances below can assist the Court to properly contextualize his offense.

*i. Mr. Wang's Plea Agreement: Count 12*

Mr. Wang pled guilty to Count 12, a violation of 18 U.S.C. § 1001(a)(3), in connection with the submission of an academic warning letter to SEVP.  The Plea Agreement provides:

> On or about December 16, 2010, I was the Chief Executive Officer and sole Designated School Official for Herguan University, located in Sunnyvale, California.  On this date, I knowingly made and used a false document, specifically an Academic Warning Letter for Herguan University, knowing that it contained a materially false, fictitious, or fraudulent statement, in a matter within the jurisdiction of the U.S. Department of Homeland Security, part of the executive branch of the United States, by providing it to DHS's Student Exchange and Visitor Program (SEVP).

(Plea Agreement ¶ 2.)

Mr. Wang offers the following as further explanation of this incident: on November 17, 2010, government agents from SEVP conducted a compliance site visit at Herguan.  The agents inquired whether Herguan issues academic warnings to students with poor attendance.  At the time of the site visit, Herguan indeed issued academic warnings in the form of emails and oral warnings.  For example, Fay Huang, Herguan's former Academic Assistant and Registrar, advised Mr. Wang that she had provided oral and written warnings to students, including emails attached hereto as exhibits.  *See* Declaration of Max Mizono, Exh. "E".  Mr. Wang further knew that Herguan previously issued email and oral warnings, and based on its Academic Handbook, had policy to issue warnings.  *See* Declaration of Max Mizono, Exh. "F".

As a result, and according to the SEVP inspector's field notes, Mr. Wang answered in the affirmative that Herguan indeed issued academic warnings to students.  The field notes do not indicate, however, that Mr. Wang stated Herguan sends out academic warning letters.  *See* Declaration of Max Mizono, Exh.  "G".  On that same compliance visit, SEVP agents issued a Request for Evidence, including a request for a copy of Herguan's "attendance and/or academic warning letters."  *See* Declaration of Max Mizono, Exh. "H".

At the time of the compliance site visit, Mr. Wang was undoubtedly aware academic warnings were given in some fashion.  But, he was not aware of *standard* academic warning letters being "sent to students."  As a follow up to this issue, on December 1, 2010, Mr. Wang emailed Herguan's Vice President of Organizational Development, Richard Friberg regarding whether academic warning letters were "sent" to students.  The correspondence between Mr. Friberg and Mr. Wang discussed Herguan's existing attendance and satisfactory academic progress policy letters and embedded them in the emails.  *See* Declaration of Max Mizono, Exh. "I".

Following his correspondence with Mr. Friberg, about two weeks later, on December 16, 2010, Mr. Wang responded via letter to SEVP's Request for Evidence.  *See* Declaration of Max Mizono, Exhibit "J".  In that letter, Mr. Wang attached academic warning letters, which indeed already existed, and indicated to SEVP that they were "sent to students."  But since the letters had not been sent to students previously, the submission of the letter to SEVP, coupled with the attachment of the academic warning letters, and the statement to SEVP that the letter is "sent to students", formed the basis of conviction for Use of False Document in violation of 18 U.S.C. § 1001(a)(3).  All in all, Mr. Wang's conduct was certainly illegal, but not morally reprehensible.  The manner in which that illegality was achieved, however, is worth mentioning.

Indeed, Richard Friberg, the individual Mr. Wang worked with in this regard, accurately summarizes the "elephant in the room" underlying the nature and circumstances of Mr. Wang's offense:

> "I think the one character flaw that is probably the cause of this whole wrong doing is that [Mr. Wang] was always in a hurry to get things done.  I should say, if I did find something that [Mr. Wang] was doing wrong, he would correct it right away…Since it has been such a long wait to get to this point, I believe he has learned things cannot get done in a speedy way and turn out well.  I believe he has learned to work through a process and not just jump to the end.  It is important to note again, I have experienced, every time I have informed [Mr. Wang] about something being done incorrectly, he always made it right."

*See* Declaration of Max Mizono, Exh. "K" (alteration in original).

*ii. Mr. Wang's Plea Agreement: Related Conduct*

The plea agreement further provides:

> I agree that I also participated in a scheme to commit visa fraud, which involved more than one hundred immigrations-related documents known as Forms I-20.  I further agree that I knowingly and intentionally assisted Herguan employees in accessing, without government authorization, SEVP's nonpublic computer database known as the Student and Exchange Visitor Information System (SEVIS).  I agree that this computer was used nonexclusively by or for the United States Government, but that the unauthorized access that I facilitated affected that computer's use by or for the United States Government.

(Plea Agreement ¶ 2.)

Again, Mr. Wang does not contest his plea agreement, but instead, offers the following as supplemental information: as PDSO of Herguan, Mr. Wang had certain obligations.  One was to enter and update information regarding foreign students accepted into Herguan into SEVP's computer system, called SEVIS.[6]  Another obligation was to issue a form called an I-20[7] to

---

[6]     As noted above, SEVIS stands for the Student and Exchange Visitor System, the electronic database for the submission of I-17 petitions, Forms I-20 and other documents related to SEVP.  *See* PSR ¶ 6.

[7]     The Form I-20 (also known as the Certificate of Eligibility for Nonimmigrant (F-1) Student Status-For Academic and Language Students) is a United States Department of Homeland Security, specifically ICE and the Student and Exchange Visitor Program (SEVP), document issued by SEVP-certified schools (colleges, universities, and vocational schools) that provides supporting information on a student's F or M status. Since the introduction of the Student and Exchange Visitor Information System (SEVIS) run by SEVP, the

---

Defendant Jerry Wang's Sentencing Memorandum
[Case No.: CR 12-00581-EJD]

12

foreign students, which enabled foreign students to obtain visas to enter the United States and demonstrate their status as a non-immigrant student entitled to be in the United States.  To that end, SEVP issued Mr. Wang a username and password to access SEVIS.

Mr. Wang's responsibilities as PDSO of Herguan required that he access SEVIS to print and then sign the I-20 forms before sending them to students.  The conduct related to Mr. Wang's offense, referenced in the plea agreement, arises from: (1) Mr. Wang giving his SEVIS password to other Herguan staff members whom he trained to assist with entering in information and printing I-20s when he was away from the office; and (2) Mr. Wang authorizing his mother to sign the I-20s on his behalf when he was unavailable.  The Court should note, however, that defense counsel understands that:

- zero evidence exists that anyone at Herguan entered any false information into the SEVIS computer;

- zero evidence exists that any foreign national was improperly allowed to enter the United States as a result of any conduct by Mr. Wang;

- zero evidence exists that any Form I-20 issued by Herguan included false information (aside from the signatures not signed by Mr. Wang);

- zero evidence exists that the United States or SEVP suffered any damages, injury, or harm as a result of these circumstances.

### a. Access to SEVIS

As previously noted, Mr. Wang provided his user ID and password to access SEVIS to administrative personnel at Herguan, and authorized them to access SEVIS.  Mr. Wang now

form also includes the student tracking number (SEVIS ID number) and school code. The Form I-20 is only for F-1, F-2, M-1, and M-2 statuses. J-1 and J-2 status holders have an equivalent Form DS-2019 which is issued by a United States Department of State-designated J exchange visitor program.

knows this course of action was wrong and is deeply sorry for it.  However, Mr. Wang did this for the ministerial purpose of helping with data entry.  For example, when Mr. Wang was away from the office or traveling, he elicited the help of other staff members to enter in student information for admitted non-immigrant students.  Mr. Wang trained these assistants and did not give his password to anyone outside of Herguan.

Despite the sharing of this information, defense counsel understands that no evidence exists that any false information was entered into SEVIS for any students when other Herguan staff members acted on Mr. Wang's behalf.  Defense counsel further understands that no evidence exists that students who entered the United States with I-20s issued by Herguan should not have been allowed to enter the United States otherwise.  Thus, although Mr. Wang allowed his assistants to access SEVIS on his behalf without the authorization of SEVP, there is no demonstrable harm to SEVP, the United States, or any of the students.

It must be further mentioned that Mr. Wang tried, on multiple occasions, to obtain SEVP approval for other Herguan Designated School Officials ("DSOs"), so that his responsibilities could be more evenly distributed across Herguan staff.[8]  SEVP, however, only granted approval to Mr. Wang's after four years of inquiry.  Therefore, despite SEVP's response to Mr. Wang that approval would take only three to four weeks after submission, it took substantially much longer.

It also bears mentioning that when SEVP conducted its compliance site visit to Herguan in November 2010, government agents explained to Mr. Wang that he should not give out his username and password to other staff members.  When asked whether he provided his password

---

[8]     As previously noted, Mr. Wang was reluctant to join the family business in the first place, and grew disillusioned working for his parents.  He sought other employment options and one of the main reasons for doing so was that his parents brushed aside his opinions and recommendations.

to assistants, Mr. Wang was forthright and affirmed he did.  Mr. Wang immediately ceased this practice after being told not to by the government agents.

Nevertheless, following this site visit in 2010, in which these prohibitions were explained to Mr. Wang, it not until March 14, 2011, that SEVP clarified its regulations banning the sharing of passwords with others, and later, in October 2011, SEVP issued its first ever "SEVP Spotlight" further clarifying, for the first time, the password sharing issue.  *See* Declaration of Max Mizono, Exh. "L".

Given these amendments and updates to the SEVP regulations regarding password sharing, it is logical to presume that other SEVIS users were sharing passwords, so much so that SEVP wrote in its bulletin that an "increase" in "password sharing."  *Id.*  Hardly any doubt exists that password sharing in SEVIS was widespread at this time, and Mr. Wang, like many others, took part in it.

### b. Signing Form I-20s

Mr. Wang authorized his mother, Su Tong, to sign I-20s on his behalf when he was unavailable.  When signing such documents, Ms. Tong acted only within the authorization given to her by Mr. Wang, and even when she did, Mr. Wang reviewed them for accuracy.  There is no evidence that Mr. Wang's mother signed any I-20s Mr. Wang did not authorize her to sign.  There is no evidence that the I-20s contained any false information or were wrongly issued to a student.  Moreover, even though Ms. Tong was not an official DSO for Herguan, she was an SEVP approved DSO for East-West.  In such capacity, SEVP approved Ms. Tong to sign I-20s for a related university.

In sum, the nature and circumstances described above should hopefully guide this Court to properly contextualize Mr. Wang's offense.  Mr. Wang apologizes to the Court and to the

United States Government for not following the rules and regulations of his job.  But, it was never Mr. Wang's intention to commit fraud, willingly break the law, cheat the system and gain an advantage for the benefit of his family businesses.  Mr. Wang was assuredly sloppy and inattentive at his job, and delegated administrative duties when he should not have.  Such carelessness indeed rose to the level of criminal conduct for which he faces punishment.  But it is important to note that no evidence exists that any *tangible* harm flowed from his actions.  Nevertheless, not a day passes in which Mr. Wang does not contemplate his tremendous mistakes and wishes he had been more meticulous.

    For this reason, as well as the others described above, a three-month sentence at the low end of the negotiated sentencing range, is a fair and just result for Mr. Wang's case given the nature and circumstances.

### 2. Mr. Wang's History and Characteristics

    As noted, Mr. Wang erred tremendously.  He knows he made a mistake and continues to pay the price for his mistake.  But his single lapse in judgment does not negate a lifetime of good character.  It is abundantly clear, and the attached character letters demonstrate, Mr. Wang is dedicated to his family, compassionate and inclusive towards his friends, and all in all, a selfless individual.  Of most importance, Mr. Wang is a loving and supportive father to his young daughter and has worked hard to finally find a job to support his family.  Were Mr. Wang to be incarcerated, no matter how brief, it would tear his family apart.  A sentence at the very low end of the Plea Agreement's agreed upon range is a sentence that affords the Wang family the best way to move forward from under this cloud of prosecution.

//

//

1

*i. Mr. Wang as Husband and Father*

2      Mr. Wang's marriage in October 2009 to Isabel Qian Wang brought upon the birth of his

3  first child, Anna, on June 22, 2012.  Since starting a family, Mr. Wang's devotion to them is

4  unwavering.  Friends Yan Zhang, Stephens Xu and Raymond Ding write: "[Mr. Wang is] a

5  faithful and dedicated family man...[he] would sacrifice anything for his family."  *See*

6  Declaration of Max Mizono, Exh. "M" (alteration in original); "[Mr. Wang] is a good father, a

7  good husband, and he trie[s] his best to provide and care for his family…[Mr. Wang] is always

8  [his family's] personal driver, bodyguard, waiter at dinner tables and the guy that pays the bill."

9  *See* Declaration of Max Mizono, Exh. "N" (alteration in original); "over the years I [have] seen

10  [Mr. Wang] grow from a young man to a caring husband and a loving father.  He adores his

11  family, and his family needs him."  *See* Declaration of Max Mizono, Exh. "O" (alteration in

12  original).

13      Mr. Wang's attentiveness and love towards his daughter is all the more discernible.

14  Friends Eva Mei, Chengcheng Hu and Xin Zhang write: "[Mr. Wang] loves his family.  It was an

15  easy thing to see because his face lightens up when he talks about his family and especially his

16  little daughter.  [Mr. Wang] and his wife [are] a great couple as they share they same family

17  values.  They make sure to spend quality time with each other and their daughter."  *See*

18  Declaration of Max Mizono, Exh. "P" (alteration in original); "[Mr. Wang] really loves his

19  daughter Anna. [Mr. Wang] talked with my husband a lot about how to be a father and helped

20  me figure out how to be a good mother." *See* Declaration of Max Mizono, Exh. "Q" (alteration in

21  original); "[Mr. Wang] spends a great deal of time with his daughter and drops [her] off and

22  picks [her] up daughter preschool every day.  I know [Mr. Wang] has a great education plan for

23  his daughter and is committed to continually to be a steady provider and protector

24

25

unconditionally to his families and the lives of his daughter." *See* Declaration of Max Mizono,

Exhibit "R".

But it is Qian Wang, Mr. Wang's wife, who best captures Mr. Wang's love and support

for his family.  She writes:

> "For the past five years since I arrived at United States, [Mr. Wang] ha[s] always taken care of me, made sure that I felt home in a country where everything was new and unfamiliar to me.  He taught me many things and helped me to start a new life here in America...From the first day of our marriage, other than at work, he was always by my side.  We cook, exercise and go on vacation together.  Now our most important mission is to raise our loving daughter together. Anna, our only daughter, is a god's gift for us...In the past [three] years, he was trying to overcome the biggest obstacle in his life [the instant prosecution], while learning how to be a good father.  I think he was more than perfect; he took our daughter to crab fishing, camping, never missed a birthday party and he took Anna to and from school everyday.  Under his care, our daughter grew up happy and healthy.  [Mr. Wang] ha[s] never [] once brought negative emotions to Anna regarding this  [prosecution].  I think this is not something anyone could have done, and I thank him for the things he did and still do[es] for his family."

*See* Declaration of Max Mizono, Exh. "S" (alteration in original).

It is evident that Mr. Wang multifaceted role of caretaker, role model, emotional and

financial supporter to his wife and daughter cannot be replicated.  Were he to be incarcerated, his

void would certainly be felt.  As such, Mr. Wang deserves the chance to remain in his family's

life without interruption.

### ii. Mr. Wang as Dutiful Son

The individuals who know Mr. Wang best, are undoubtedly, his two parents, mother Su

Tong and father Yinqiu Wang.  In the same way Mr. Wang treats his daughter and wife in all

regards, Mr. Wang's good character has been evident to his parents from day one: "[Mr. Wang is]

a conscientious, dedicated and diligent man...he loves and respects his parents, he takes care of

everything that his parents need...[Mr. Wang] always deals with everything with a positive

attitude and manner and ... is a warmhearted, honest, and upright man." *See* Declaration of Max

Mizono, Exh. "D" (alteration in original); [Mr. Wang] is honest, mild-tempered...a good man with a heart of gold...as his mother, I taught him to be a good person. I watched him grow up as an upright, positive, conscientious man. I believe that he would never break any rules and/or laws deliberately. His intention is to do [the] right thing always." *See* Declaration of Max Mizono, Exh. "C" (alteration in original).

Aside from his obvious good characteristics, what stands out most from Mr. Wang's parents were the sacrifices he made on their behalf. Dr. Wand and Ms. Tong write:

> "My achievement is not possible if I didn't move to the U.S., and it is also not possible without my son's sacrifice. He devoted his time, he gave up his own dream...he was very brave to step to be CEO in the first place, and he was willing to learn, and he paid special attention to details, he consider others' need before his...with good intention he helped me, so I have time to do research and innovation, and contribute to United States."

*See* Declaration of Max Mizono, Exh. "D" (alteration in original).

> "[Mr. Wang] should have been like other college graduate[s] to pursuit his own dream when he graduate...we in some degree forced him to help us because of our language limitation. We felt sad and guilt for what happened to him."

*See* Declaration of Max Mizono, Exh. "C" (alteration in original).

While Mr. Wang's action certainly placed him before the Court, there is little doubt that he followed his parents into the family business and was thrust with responsibilities he might not have been ready for. He did this as a dutiful son, and as the only child of Chinese immigrants. It As Ms. Tong noted, Mr. Wang always wanted to do what the right thing for his family, even if that meant sacrificing his own goals and dreams. It is rather unfortunate that Mr. Wang finds himself in the position he is in today, but his intentions always came from the right place.

### iii. Mr. Wang's Good Character to All

There can be no doubt that Mr. Wang is a great husband, father and son. But his strong character extends to all those around him. Quite simply, Mr. Wang is someone others can depend on and reach out for help, whatever the situation. Friend Fan He writes: "I always

remember [Mr. Wang] as a very caring person, genuinely interested in the well-being of people that surround him.  He will always find the time to listen or help out other people, even though he is busy all the time.  He cares deeply and sincerely about his friends and people he knows...to put it simply - and there are not too many different words to express this: [Mr. Wang] is a great friend…I find it particularly hard to meet people as humble, friendly and trustworthy as he is."  *See* Declaration of Max Mizono, Exh. "T" (alteration in original).   Countless friends, colleagues, and acquaintances concur:

- "[Mr. Wang] is a loyal, honest[] person and caring...He was always there for his friends when we had rough times."  *See* Declaration of Max Mizono, Exh. "U" (alteration in original);

- "I was impress[ed] on how intelligent, friendly and consider[ate] he is.  He seems to be the one who bring the joy and happiness around to all his friends...[Mr. Wang] is a kind, sympathetic and warmhearted person."  *See* Declaration of Max Mizono, Exh. "R" (alteration in original);

- "[Mr. Wang] is a friends first guy...[he] is a simple, good, sincere, compassion[ate] and [a] polite friend of our family."  *See* Declaration of Max Mizono, Exh. "Q" (alteration in original);

- "[Mr. Wang] is one of the great people I have met in my life, and I am glad having him as a true friend who would be there for me when I needed help."  *See* Declaration of Max Mizono, Exh. "V" (alteration in original);

- "As the years go by, I am proud to consider [Mr. Wang] as one of the finest people I've known and that he is the kind of friend who would be there if I needed him." *See* Declaration of Max Mizono, Exh. "P" (alteration in original);

- "[Mr. Wang] is such a kind and helpful person.  I remember one time asking him to bring an extra long Chinese instrument back from Shanghai since he was there for a business event, he right away agreed to help me and spent extra time waiting for my friend to drop off the instrument to him."  *See* Declaration of Max Mizono, Exh. "W" (alteration in original);

- "To me [Mr. Wang] has always been a positive and enthusiastic person who tries to help people who are in need.  When I just immigrated to California with my family, I couldn't drive, that was when [Mr. Wang] drove me around the area and helped me settle down in this new environment." *See* Declaration of Max Mizono, Exhibit "M" (alteration in original)

- "He volunteers for the community.  There were multiple occasions that we took notice of him putting other people before himself.  He is always willing to help when people are in need and do everything within his power to support others."  *See* Declaration of Max Mizono, Exh. "X".

- "[Mr. Wang] is a friend person and always ready to help others.  Many students benefitted from [Mr. Wang's] help.  [Mr. Wang] often drove the students from and back to Caltrain station or bus station who couldn't drive.  [Mr. Wang] cares for the living and life of international students and the students moved from other states.  If the student couldn't find a rental housing, [Mr. Wang] even let the student live at his house and helped the student look for rental housing.  Many students became his good friends after graduation." *See* Declaration of Max Mizono, Exh. "Y" (alteration in original);

- "[Mr. Wang] has an incredible ability to support and cheer up everybody who comes in contact with him.  He goes out of his way to help even strangers.  On several occasions

my son has mentioned that when he grows up he wants to be like [Mr. Wang]." *See* Declaration of Max Mizono, Exh. "Z" (alteration in original).

But perhaps the greatest indication of Mr. Wang's good character is towards those most similar to himself.  Indeed, Mr. Wang has drawn upon his own negative experiences as a foreign youth growing up in Oakland, to help his friends better assimilate to life in the United States.  In such capacity, Mr. Wang endeavors to create a sense of community amongst his fellow Chinese compatriots and is viewed as the "go to person" amongst his Chinese friends.  Stephens Xu explains:

> "Both me and [Mr. Wang] belong to a social circle of mostly Chinese immigrants.  Many of our mutual friends have only moved [to the] U.S. in recent[] years and need a lot of help to gain their footing and start a new life in America.  [Mr. Wang] was the guy that stood out to offer as much help as possible, and that's one of the reasons he became a significant and popular figure among us...[As such, Mr. Wang] is somewhat of a significant figure in my closest social circle, in part because he was very kind and generous.  Every Saturday we play basketball together with a group of mostly Chinese Americans at Google's Mountain View court, and almost every Saturday night [Mr. Wang] would host a 'game night' in his house, where a group of [six] or [seven] people including myself play cards and board games in his house.  Therefore his home became the 'hotspot' for his closest friends in the Bay Area."

*See* Declaration of Max Mizono, Exh. "N" (alteration in original).

A low-end guideline range sentence will allow Mr. Wang to continue drawing on his own life experiences in the United States, and remain a positive influence in the lives of his many friends who are recent immigrants.  Were he to be incarcerated, his friends would lose the influence of a caring and compassionate man who has helped so many feel welcomed in his community.

### iv. Philanthropic Efforts and Relationship Building in Asia

Mr. Wang's compassion for helping others has also benefitted communities as far as a village in Cambodia.  Around 2008, during a visit to the country, Mr. Wang volunteered to teach

English at the local orphanage for a few days which led to further efforts to build an orphanage. Several of Mr. Wang's friends and former colleagues describe these efforts: "I remember [Mr. Wang] talked about his charity work in Cambodia passionately...Eventually, with the cooperation from local government, he built an orphanage and sponsored quite a few orphans for their education expense." *See* Declaration of Max Mizono, Exh. "A1" (alteration in original); "[Mr. Wang] really loves kids and spent a lot time with children.  Before his daughter born, he went to Asia for a couple of months to build a elementary school.  That school helped children who[se] family cannot handle the tuition.  Jerry founded the school for those poor children and all for free."  *See* Declaration of Max Mizono, Exhs. "Q" and "D1".  Qian Wang further elaborates:

> "During a trip to Cambodia in 2009, [Mr. Wang] found out that many kids there became orphaned because their parents died from civil war and uncleared land mines. Those kids lived with host families, most of time with [seven] to [eight] kids fitting in a tiny living room, in a house built with unsafe construction materials. He was touched by what he had seen, and decided to do something to help those orphans. He started an orphanage in Cambodia with the help of a local NGO director. He calculated that, for about $35 US dollars of aid every month, it would be enough to provide food, rent and education, and he could potentially help up to [ten] kids.  [Although the school had to close]...one of his biggest dream[s] in his future is to re-establish this orphanage, so that he can help those kids again."

*See* Declaration of Max Mizono, Exh. "S" (alteration in original).

Mr. Wang has also led delegations from the United States to participate in cross-cultural exchanges with China.  One participant describes: "in 2003, [Mr. Wang] accompanied me and a group of business leaders on a trip to China.  He served as my interpreter and guide in an excellent way.  It was a productive, safe, and fun trip.  The China trip was so successful, that Jerry and myself were asked to return and joined several mayors from Silicon Valley cities.  The Vice Mayor of Xin Xiang in the He Nan province came to visit Sunnyvale [afterwards], and

Jerry was included in the festivities." *See* Declaration of Max Mizono, Exh."B1" (alteration in original); *see also* Declaration of Max Mizono, Exh. "C1".

While these cross cultural efforts and exchanges do not minimize Mr. Wang's offense, they help portray the type of person he is and what he stands for: helping others, community building and fostering a sense of global goodwill. This Court no doubt adjudicates defendants each and every day. Mr. Wang is unique in the sense that his good acts outweigh the harm caused by the instant prosecution.

*v. Current Employment*

Mr. Wang has endured much difficulty finding suitable employment during the pendency of this prosecution following his leave from Herguan. He indicated as much in his interview with Probation. *See* PSR ¶ 45. In fact, it has taken him over three years since indictment to finally realize a full time position, which he recently obtained with Intero Real Estate Services, located in Cupertino, California. There, Mr. Wang "started as an assistant with low pay" but was "recently made [] a full time employee." *See* Declaration of Max Mizono, Exh "E1" (alteration in original). Through Mr. Wang's "desire to start from the bottom and make it on his own [he]…work[ed] hard" and "created value for [the] business" and has become an integral part of the company. *Id.* If Mr. Wang were to be incarcerated, however, Intero would be "forced to fill his position with someone else…despite invest[ing] resources into [Mr. Wang] and rely[ing] on him in day-to-day operations." *Id.* Accordingly, given Mr. Wang's new position, it would make sense for this Court to allow him to continue contributing positively to society and providing for his family without substantial interruption.

//

//

**B. A Three Month Sentence Meets the Directives of 18 U.S.C. § 3553(a)(2)**

18 U.S.C. § 3553(a)(2) directs the Court to consider "the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment for the offense, to afford adequate deterrence, and to protect the public from further crimes."  A three-month sentence meets these directives.

**1. A Three-Month Sentence Reflects the Seriousness of the Offense**

While all violations of federal law are to be taken seriously, there can be no doubt that certain offenses, e.g., hands-on child sex offenses, high level methamphetamine trafficking, and RICO conspiracies, are more serious than an offense involving a violation of 18 U.S.C. § 1001(a)(3), Use of False Document.  Appropriately, the United States Sentencing Commission has noted the seriousness of the offense may be lessened, for example, if the crime was victimless or was not violent.  *See* 28 U.S.C. § 994(j) (prison is generally inappropriate in "cases in which the defendant is a first offender who has not been convicted of a crime of violence or an otherwise serious offense," while some term of imprisonment is generally appropriate for "a person convicted of a crime of violence that results in serious bodily injury").

Here, there was no "victim" in the traditional sense of the word.  Nor was Mr. Wang's offense violent.  While the absence of these factors does not minimize Mr. Wang's offense, the recommended sentence adequately accounts for its seriousness.

**2. A Three-Month Sentence Promotes Respect for the Law**

A three-month sentence promotes respect for the law.  Mr. Wang, and his family of immigrants, moved to this Country in pursuit of a better life, including *inter alia*, better protection under this nation's unique and unparalleled legal system.  There can be no doubt that Mr. Wang and his family hold in high esteem the laws of the United States.  And although Mr.

Wang broke the law and has pled guilty to illegal conduct, it was never his intent in coming to this country to do so, like countless other defendants this Court has the opportunity to adjudicate on a regular basis.  Aside from the instant prosecution, Mr. Wang has been a law-abiding citizen, as have his parents and wife.  The recommended sentence would indeed promote respect for the law.

### 3. A Three-Month Sentence is Just Punishment

The stigma of a felony conviction alone is significant punishment.  For example, the felony conviction and likely conditions of supervised release will impinge Mr. Wang's ability to travel abroad, including to China, where his extended family resides.  Mr. Wang has already been unable to, on numerous occasions, accompany his wife to visit her family.  Any lengthy sentence of incarceration will further preclude him from visiting his family.  It also precludes from obtaining certain jobs, such as government work.

### 4. A Three-Month Sentence Affords Adequate Deterrence

Empirical evidence is unanimous that no relationship exists between sentence length and general or specific deterrence, regardless of the crime type.  *See* Andrew von Hirsch, *et al.*, *Criminal Deterrence and Sentence Severity: An Analysis of Recent Research* (1999) (concluding that "correlations between sentence severity and crime rates . . . were not sufficient to achieve statistical significance," and that "the studies reviewed do not provide a basis for inferring that increasing the severity of sentences generally is capable of enhancing deterrent effects.").  Additionally, courts have recognized that even short sentences can have a strong deterrent effect on white-collar criminals.  *See e.g., United States v. Adelson*, 441 F. Supp. 506, 413-14 (S.D.N.Y. 2006).

Here, the requested three-months sentence affords adequate deterrence.  Mr. Wang has already lost his job and has been unable to financially support his family throughout a large duration of this case, but has now finally been able to do so.  Mr. Wang has certainly learned his lesson from this unfortunate experience and the Court can be certain it will never see Mr. Wang again.

Moreover, since Mr. Wang has already pled guilty, any need for further deterrence and protection of the public is lessened because the conviction itself already visits substantial punishment on the defendant.  *See, e.g., United States v. Stewart*, 590 F.3d 93, 141 (2d. Cir. 2009).  Not a day goes by that Mr. Wang fails to think about this offense with deep regret and shame that he brought upon himself and his family.  Former co-workers and friends explain:

- "Over the past three years, I know [Mr. Wang] has suffered a great deal for what he has done.  He has gone through his highs and lows, blaming himself and sometimes others, always going back to blaming himself, crying and being depressed, wishing he could go back and undo what happened…Jerry knows he will not be able to return to his family's business, at least not for a very long time.  This is a great disgrace for his family and him.  He knows he has done wrong, he knows he cannot skip through the rules and do things his own way and ignore procedures.  He is no threat to the community.  This past three years has been a sentence in and of itself." *See* Declaration of Max Mizono, Exh. "K" (alteration in original);

- "He has already experienced ostracism, embarrassment, and loss of job.  Life will never return to where it was for him." *See* Declaration of Max Mizono, Exh. "F1".

- "I know that [Mr. Wang] is extremely remorseful for his actions.  He is all too aware of how this has negatively impacted his family, career, various relationships, and how his

daughter will view him when she grows up.  I think he has already learned his lesson, and will continue to bear the burden of the damage that has already fallen on himself and his family for many years to come, regardless of the outcome."  *See* Declaration of Max Mizono, Exh. "G1" (alteration in original).

- "Although his sentence has yet to be concluded, he has been trying to make up for his potential absence in Anna and Qian's life as the father and husband.  I can sense that he is filled with remorse and shame towards his prosecution." *See* Declaration of Max Mizono, Exh. "I1" (alteration in original)

For this reason, Mr. Wang's sentencing position is appropriate.

### 5. A Three-Month Sentence Protects the Public from Further Crimes

This consideration is aimed chiefly at criminal defendants with lengthy criminal histories who are likely to reoffend.  Mr. Wang is not that type of defendant.  Indeed, Mr. Wang has no prior criminal history or issues of any kind with law enforcement.  A jail sentence is not necessary to protect the public from Mr. Wang given there is virtually no chance he will reoffend.  Also, the agreed upon forfeiture amount of $700,000, which far exceeds any benefit Mr. Wang personally derived from the offense, is substantial punishment.  A custodial sentence of three months, coupled with this forfeiture amount, is sufficient to protect the public from any further crimes.

### C. A Three-Month Sentence Served is Appropriate for this Court to Avoid Unwarranted Sentencing Disparities

This Court must also consider the "need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."  18. U.S.C. § 3553(a)(6).  Three months is a sentence squarely in line with sentences imposed for convictions of 18 U.S.C. § 1001(a)(3) in comparable cases across District Courts in California.  On the other

hand, a more significant custodial sentence is disproportionate to sentences imposed for such

convictions.  The chart below summarizes comparable cases:

| District | Case Name | Docket No. | Year | Sentencing | Plea | Convictions in addition to use of false documents |
|----------|-----------|------------|------|------------|------|--------------------------------------------------|
| SDCA | *USA v. Khast* | 3:14-CR-02862 | 2015 | Time served | Yes | |
| NDCA | *USA v. Chen* | 4:13-CR-00771-JST | 2014 | 24 months probation | Yes | +Lacey Act false labeling |
| CDCA | *USA v. Forde* | 8:11-CR-00212-JLS | 2014 | 24 months probation | Yes | |
| CDCA | *USA v. Saran* | 2:14-CR-00064-MWF | 2014 | 36 months probation | Yes | |
| CDCA | *USA v. Reddy* | 2:12-CR-01049-MWF | 2014 | 36 months probation | Yes | |
| CDCA | *USA v. Snyder* | 2:12-CR-01062-GAF | 2014 | 4 months custody | No | +Theft of government property |
| NDCA | *USA v. Su* | 4:11-CR-00288-JST | 2014 | 60 months custody | No | +Wire fraud, mail fraud, conspiracy and aiding and abetting to commit visa fraud, false statements to the government, alien harboring, unauthorized access of a government computer, and money laundering |
| CDCA | *USA v. Roy* | 2:12-CR-00546-R | 2013 | 60 months probation | Yes | |
| CDCA | *USA v. Carriere et al.* | 2:10-CR-00952-VBF | 2011 | 12 months probation | Yes | |
| CDCA | *USA v. Buzarde* | 2:06-CR-00804-MMM | 2011 | 27 months custody | Yes | |
| SDCA | *USA v. Huizar-Velazquez* | 3:10-CR-03099-JAH | 2011 | 60 months custody | Yes | |
| NDCA | *USA v. Harris* | 3:09-CR-00908- | 2010 | 60 months probation | Yes | |

| | | CRB | | | | |
|---|---|---|---|---|---|---|
| NDCA | *USA v. Tomlin* | 4:08-CR-00358-PJH | 2009 | 13 months custody | Yes | |
| NDCA | *USA v. Evans* | 4:08-CR-00011-JSW | 2008 | 60 months custody | Yes | +Interference with security screening person |

Of the fourteen cases that included convictions under 18 U.S.C. § 1001(1)(3), six defendants, like Mr. Wang, were convicted of only the use of false documents. Five of these six defendants received probationary sentences ranging from 12 to 60 months. Only one defendant received a custodial sentence, but he was sentenced to time served. From the docket, it appears the defendant had previously served just one day in custody.[9]

In two other cases, the defendants were also sentenced to probation even though they were convicted of offenses in addition to the use of false documents. Another defendant who was convicted of offenses in addition to the use of false documents exercised his right to trial by jury, lost, and was still only sentenced to four months' imprisonment. In the remaining five cases, the defendants were convicted of other crimes in addition to the use of false documents and received custodial sentences ranging from 13 to 60 months imprisonment.

For a closer comparison between similar cases, Mr. Wang's conduct and acceptance of responsibility are similar to the defendants who received probation. For example, in *United States v. Saran*, the defendant was charged with engaging in a scheme to defraud the United States Citizenship and Immigration Services. Through defendant's company, defendant "engaged in a scheme to submit false employment-based non-immigrant petitions and supporting documents to the government with the purpose of obtaining fraudulent non-immigrant work visas for Indian nationals who were the beneficiaries of these false petitions." [Case No. 14-CR-

---

[9]      From the docket sheet of *United States v. Khast*, it appears Mr. Khast surrendered to custody, was arraigned, and then released on bail all on the same day.

00064-MWF, at Dkt. No. 8, filed on February 2, 2015.]  For this conduct, the defendant pled

guilty to one count under 18 U.S.C. § 1001.  *Id.*  The parties agreed that the total offense level

would be 10 and the criminal history category would be I, but the government requested a

sentence of six months imprisonment for the sophistication of the scheme, whereas the defense

asked for three years probation, including home detention for six months. [Dkt. Nos. 20 and 24,

filed on June 10 and 11, 2014.]

      According to the government, more than 100 false petitions had been submitted.  *Id.*   The

court ultimately adopted the defendant's request and sentenced him to three years' probation and

six months of community and home detention.  [Dkt. No. 28, filed on June 17, 2014]

Admittedly, the total offense level in *Saran* was lower than the total offense level Mr. Wang

faces.  But similarities between the two cases in terms of offense conduct (e.g., submission of

false documents to immigration authorities within the Department of Homeland Security),

uncharged conduct (e.g., over 100 false documents implicated), as well as the single conviction

under 18 U.S.C. § 1001 militate in favor of a sentence of three months' imprisonment.

Furthermore, as discussed above, mitigating circumstances surround the uncharged conduct in

Mr. Wang's case regarding SEVIS access and I-20 signatures.

      In addition, Mr. Wang's conduct compares favorably with the defendants who received

probation but were convicted of multiple offenses in addition to the use of false documents.  *See

United States v. Harris*, Case No. 09-CR-00908-CRB (five years probation including one year of

home detention for defendant convicted of two counts under 18 U.S.C. § 1001 and theft of public

money with a disputed criminal history category of II to IV); *United States v. Chen*, Case No. 13-

CR-00771-JST (three years probation for defendant convicted of four counts under 18 U.S.C. §

1001 and the Lacey Act).

Mr. Wang's conduct and acceptance of responsibility also compares favorably with that of a defendant who received four months' imprisonment. In *United States v. Snyder*, Michael Leslie Snyder did not enter into a plea agreement and was convicted after trial on nine counts of theft of government property and using/making false statements for receiving Supplemental Security Income benefits to which he was not entitled. [Case No. 12-CR-01062-GAF, at Dkt. 100, filed November 21, 2013.] The government and defense disagreed on whether (1) the total offense level was 7 or 10, and (2) the criminal history category was I or II. Even though Mr. Snyder took his case to trial, as compared to Mr. Wang's acceptance of responsibility and agreement to enter a guilty plea, Mr. Snyder received a sentence of four months imprisonment. [Dkt. No 115, filed April 22, 2014.]

The remaining five cases, in which the defendants received lengthy custodial sentences, are not comparable to this case. First, each case involved multiple convictions. Second, the defendant in *United States v. Su* chose to go to trial, instead of entering into a plea, and was ultimately convicted on 35 counts.[10] Third, in *United States v. Huizar-Velazquez*. upon appeal, the Ninth Circuit actually vacated the defendant's sentence of 60 months imprisonment. The district court then resentence Mr. Huizar-Velazquez to only time served.[11] Lastly, the criminal history categories for two of the defendants were well above Mr. Wang's lack of any criminal history. In *United States v. Tomlin*, the government and defendant agreed on an above-guidelines sentence to 13 months imprisonment based on a total offense level of 7 and a criminal

---

[10]     The defendant in *United States v. Su* went to trial and was convicted on all counts, including use of false documents, wire fraud, mail fraud, visa fraud, false statements to the government, alien harboring, unauthorized access of a government computer, and money laundering. [Case No. 11-CR-00288-JST, Dkt. No 119, filed March 24, 2014.]

[11]     In *United States v. Huizar-Velazquez*, the Ninth Circuit concluded that the district court had erred in its choice of sentencing guideline in reaching a sentence of 60 months' imprisonment. [cite ecf 69] In October 2013, the district court resentenced Mr. Huizar-Velazquez to time served since the original judgment in June 2011. [Case No. 10-CR-03099-JAH, at Dkt. 78.]

history category of II.  [Case No. 08-CR_00350-PJH, at Dkts. 31, 37, 38, 39.]  In *United States v. Evans*, the defense and government agreed to an offense level of 12 and a criminal history category of VI, but the presentence report recommended a total offense level of 17.  [Case No. 08-CR-00011-JSW, Dkt. No. 18, filed on July 7, 2008.]

Sentencing in comparable cases thus supports Mr. Wang's sentencing position.  Indeed, the imposition of a lengthy sentence "may work to promote not respect, but derision, of the law if the law is viewed merely as a means to dispense harsh punishment without taking into account the real conduct and circumstances involved in sentence."  *Cf. Gall v. United States*, 52 U.S. 39, 54 (2007) (internal quotations omitted).

Additionally, sentencing defendants below the applicable guidelines in appropriate cases is also consistent with the practice of this district.  The most recent figures published by the Sentencing Commission show that in fiscal year 2013, only 38.7% of defendants in the Northern District of California were sentenced within the applicable guideline range.  *See* Declaration of Max Mizono, Exh. "H1", at p. 16.  The overwhelming majority of defendants sentenced outside the applicable guidelines range were sentenced *below* the range.  Such should be the case here as well.

**D. The $700,000 Forfeiture Amount Supports Mr. Wang's Sentencing Position**

18 U.S.C. § 3553(a)(7) directs the Court to consider "the need to provide restitution to any victims of the offense."  While there are no "victims" of Mr. Wang's offense in the traditional sense, the agreed upon forfeiture amount of $700,000 will benefit the public at large. The prepayment of such a large forfeiture amount supports Mr. Wang's sentencing position.

//

//

1

## VII. CONCLUSION

2      For the reasons set forth above, as well as for any others this Court may deem fair and

3  reasonable, a sentence at the low end of the guideline range as agreed upon in the Plea

4  Agreement, is an appropriate and fair resolution to Mr. Wang's case.

5  Dated: September 4, 2015                                    Respectfully submitted,

6

7                                                      ___/s/_____

8                                                      EDWIN PRATHER
                                                       MAX MIZONO
9                                                      PRATHER LAW OFFICES
                                                       Attorneys for Defendant
10                                                     JERRY WANG

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a copy of the foregoing SENTENCING

MEMORANDUM was served on this date to the following parties and attorneys for parties by

ECF or electronic delivery to:

> AUSA Hartley West
> United States Attorney's Office
> 450 Golden Gate Avenue, 11th Floor
> San Francisco, CA 94102
> Hartley.west@usdoj.gov

> U.S. Probation Officer Benjamin Flores
> U.S. Probation
> San Jose, CA
> Ben_Flores@canp.uscourts.gov

I certify under penalty of perjury that the foregoing is true and correct.

Executed this 4th day of September, 2015, in San Francisco, California.


_____/s/_____
MAX MIZONO